Argued October 10, affirmed November 28, 1950

IN THE MATTER OF THE ESTATE OF FRED MEIER, DECEASED

CAMPBELL ET AL. *v.* BEAL ET AL.
224 P. (2d) 572

*Larry Landgraver* argued the cause for appellants. With him on the brief was Shirley A. Field, both of Portland.

*John H. Carson,* of Salem, argued the cause and filed a brief for respondents.

Before LUSK, Chief Justice, and BRAND, ROSSMAN, HAY and LATOURETTE, Justices.

## HAY, J.

Fred Meier died in Marion County, Oregon, on October 12, 1947, leaving an estate in said county, consisting of real and personal property, the value whereof is not shown. By an instrument purporting to be his last will he bequeathed to his son, Paul Meier, the sum of $1,000, to his daughter, Helen Campbell, a like sum, to St. Benedict's Abbey, Mt. Angel, Oregon, the sum of $2,000, and the residue of his estate to Agnes Meier (now Agnes Meier Beal), a niece. The will was admitted to probate in common form on October 23, 1947. Paul Meier and Helen Campbell are Fred's next of kin, and they appeal from a decree of the circuit court

for Marion County sustaining the validity of the will as against a contest by them.

As grounds of contest the contestants' petition alleged that the will was not the voluntary act of the testator but was the result of undue influence exercised over him by said Agnes and one Roy Damon.

Issue was joined by Agnes Meier Beal individually, and as executrix of said will, and, at a hearing on the petition, the will was proved in solemn form. Thereafter, testimony was submitted by the respective parties upon the issue of undue influence, and in due course the court's decree was entered sustaining the will.

■■ It is contended that the due execution of the will was not clearly and unequivocally proved. Our statute, § 18-201, O. C. L. A., provides as follows: "Every will shall be in writing, signed by the testator, or by some other person under his direction, in his presence, and shall be attested by two or more competent witnesses, subscribing their names to the will, in the presence of the testator."

The contestants say that the evidence must show that the subscribing witnesses to the will became such at the testator's request; that they saw him sign the will, or heard him acknowledge his signature, or observed acts which unmistakably indicated that he signed it; and that acknowledgment cannot be inferred from mere silence. They cite in this connection *Luper v. Werts and Smith,* 19 Or. 122, 23 P. 850. In that case, it was held that if the evidence showed that the testator, by any sign, motion, conduct, or other attending circumstance, gave the witnesses to understand that he had subscribed the instrument, that would be a sufficient acknowledgment. Mere silence on his part would not be enough, but if he said to the witnesses: "This

is my will'', or if the attorney who prepared the will said to the witnesses, in the presence of the testator: "This is the will of Mr. Werts; he has signed it and wants you to subscribe your name to it as a witness'', or words to that effect, that would be a sufficient acknowledgment. The court said, in part:

> "* * * A subscribing witness to a will, therefore, must be something more than a person who subscribes his name as a witness to it. The testator must either sign the will in the presence of the witness, or must acknowledge to him by word or act that he had signed it. It is not necessary that the witness know the contents of the instrument subscribed by him, or its nature or character, but he must be able to testify that the principal in the affair put his name upon the identical piece of paper upon which he placed his own.''

We think that due execution of the will in the present case was sufficiently proved. Contestants, arguing to the contrary, "pass over the testimony of Mr. Linfoot, who was one of the subscribing witnesses, because he was also the attorney who was charged with the supervision of the ceremony, and if he could not absolutely testify to his adherence to the rules of proper attestation, a serious shadow would be cast on his professional ability.'' But there is no rule of law disqualifying an attorney from acting as a witness to a will merely because he drafted it or supervised its execution. Cf. *In re Skinner's Will,* 40 Or. 571, 583, 62 P. 523, 67 P. 951.

The testimony of the other witness, Mr. A. H. Schnider, is sought to be impeached by the fact that, some ten years after the execution of the will, he made an affidavit, at the request of the attorney for contestants, to the effect that he had not seen either Mr. Meier or Mr. Linfoot sign the will, but that he had

seen Mr. Linfoot's secretary sign it (who, as a matter of fact, did not sign it). On the witness stand he explained that, when he made the affidavit, he had been unable to recall the circumstances clearly, but that, after he had had an opportunity for reflection, he remembered what happened. We quote from his testimony:

"Q. Would you relate to his Honor your recollection of what happened on the occasion when you signed that will? A. I was up there at my work in the office when Mr. Linfoot came in, together with Mr. Meier. And Mr. Linfoot started to introduce us and Mr. Meier said, 'I know him,' and I said, 'yes', and, of course, Mr. Linfoot didn't know we were acquainted, and Mr. Linfoot asked me— he says, 'Mr. Meier is making a will and I have to have a couple of witnesses.'

"Q. Mr. Meier was there at that time? A. Yes. I said, 'okay, I will sign it.'

"Q. Then what happened? A. Mr. Meier signed his name."

Mr. Schnider identified Fred's signature upon the will, and testified that after Fred signed, first he and then Mr. Linfoot signed as witnesses. All three were in presence of each other, with "just a show case between them". Both Mr. Schnider and Mr. Linfoot testified that Agnes Meier was not present.

No specific request by the testator to the witnesses to sign the will was necessary. They subscribed their names in his presence; he knew that they were signing as witnesses to his will, and he made no objection. This was sufficient. *In re Ames' Will*, 40 Or. 495, 499, 67 P. 737. Moreover, the attestation clause, which recited due execution of the instrument, creates a strong presumption in favor of such due execution, which can

be overcome only by clear and convincing evidence to the contrary. *In re Davis' Will,* 172 Or. 354, 361, 364, 142 P. 2d 143; *In re Fletcher's Estate,* 147 Or. 139, 143, 32 P. 2d 123.

It is suggested that the will is an unnatural one, and that such unnaturalness is proof of abuse of confidence and the exercise of undue influence on the part of Agnes Meier Beal. The question whether or not the will was unnatural requires the statement of a portion of the evidence adduced upon the hearing.

The testator was born in Switzerland, and was brought to this country by his parents when he was about five years old. He did not have much formal schooling, but was able to read and write, and several witnesses testified that he was skillful in the handling of money. According to his brother William, Agnes's father, testator was "a little slow in fractions, but he was in business and he some times done $100.00 a day, and could change money as good as anybody." He had been at first a bartender, and, for a few years prior to state prohibition, conducted his own liquor business in Portland. He married the mother of his two children in 1903. The marriage was dissolved at the suit of the wife, by decree entered January 30, 1919. The children at that time were 13 and 14 years of age respectively, and their custody was awarded to their mother.

In December, 1919, Fred called at the office of Mr. Joseph Van Hoomissen, an attorney in Portland who had counseled him from time to time, and told Mr. Van Hoomissen that he desired to make a will. Mr. Van Hoomissen knew of Fred's family trouble and of the divorce. Fred instructed Mr. Van Hoomissen as to what disposition he desired to make of his estate, and Mr. Van Hoomissen drew a will accordingly, which

Fred executed. There seems to be some doubt as to the contents of this will. It was not offered in evidence. If Mr. Van Hoomissen retained an office copy, he was unable to produce it at the hearing. According to his recollection, the will made a bequest "to the St. Benedicts", made some provision for the testator's divorced wife, and gave the residue to his children. Flavius Meier, one of his brothers, was made executor. Flavius Meier testified that the will was made in favor of testator's brother Thomas and Flavius himself, and not in favor of Fred's children. Flavius never saw the will, however. Mr. Van Hoomissen's recollection of the details of the will was not clear, which is not surprising in view of the lapse of some thirty years between the execution of the will and the hearing of the case at bar. The will was left with Mr. Van Hoomissen until some time in August, 1934, when Fred called at Mr. Van Hoomissen's office and asked for and received his will, giving no reason why he wanted it.

Agnes Meier was born in the year 1915. After completing high school at Salem, she went to Portland and enrolled in the Behnke-Walker Business College, taking a commercial course. In 1937, she returned to Salem, and lived for a time at her father's farm, a few miles southeast of that city. Thereafter, she had temporary employment at various places in Salem, including two law offices.

Fred Meier, during that period, was in the habit of visiting his niece occasionally, during the noon hour, at the places where she was employed, sometimes bringing his own lunch there, and sometimes taking her out to lunch. Occasionally he visited at her home. She testified: "One afternoon he said he was awfully lonely and I was—it was hard on me to get back and forth

to work. I was living with my folks and I said I wished I could live in town, and he said, 'Why don't you come and make me a home, and if you come in and make me a home, I will give you everything I got.'" Fred had purchased a residence in Salem, consisting of two apartments. He lived in one of the apartments. Agnes accepted his proposal, and went to reside with him in his apartment in August, 1938. At that time the testator was about 68 years of age and Agnes was 23. She spent some time in cleaning up the apartment and getting it in order, and thereafter Fred, from time to time, discussed his business affairs with her. As to the making of the will she testified:

"A. * * * I had so much to do to get the apartment cleaned up and in order, and when things settled down one Saturday afternoon, he said, 'Shall we go up and have the will made out?' And I said it was all right with me.
* * *

"Q. What had you done in preparation of the will prior to the 12th of November? A. I didn't do anything for preparation of the will.

"Q. In your deposition, * * * when you were asked who had written it out before you went up and typed it, and you answered, 'Uncle Fred took an older will and marked out what he didn't want and wrote in what he did.' A. So he told me.
* * *

"Q. Did you do the writing on it? A. He did, I guess. He said he was going to use the will and I was going to do the typing.

"Q. You never saw the old will? A. I don't know. Yes, I saw the old will, but I didn't pay any attention to it."

The evidence indicates that in the interim between the drawing of the two wills Mr. Meier had maintained

friendly relations with his daughter, Helen, but that his relationship with his son was unfriendly. At the time of the drawing of the second will, the children had reached the ages of 32 and 33 years respectively, and Helen had married.

Besides making his will in favor of Agnes, Fred, at about the same time, made arrangements whereby his bank accounts were changed over from his name alone to the joint names of Fred Meier and Agnes Meier. Into one or other of those accounts, each of the parties thereafter made deposits, although Agnes's deposits were undoubtedly relatively inconsiderable in amount. In view of the family relationship which had been assumed by them, and other evidence of their close association and mutual dependence upon each other, it is obvious that Agnes occupied towards her uncle a highly confidential and fiduciary relation.

■■ In considering whether or not Fred Meier's will was the result of undue influence exercised by Agnes Meier, the principal beneficiary, upon the testator to the extent of overcoming his free agency, the existence of a confidential relationship between beneficiary and testator is important. Such a relationship does not of itself give rise to a presumption of undue influence, but it may be considered along with other suspicious circumstances, and, so considered, may justify an inference of undue influence sufficiently to put upon the beneficiary the burden of proving that no undue influence was exercised in fact. *In re Dale's Estate,* 92 Or. 57, 64, 179 P. 274; *In re Lobb's Will,* 173 Or. 414, 432, 145 P. 2d 808; *In re Perry's Estate,* 181 Or. 332, 181 P. 2d 783, 787. Activity by a principal beneficiary in the preparation of a will is one such suspicious circumstance. *In re Dale's Estate,* supra. But there is

an absence of any satisfactory evidence that Agnes participated in any manner, except as a typist, in the preparation of the will. Contestants' charges of such active participation on the part of Agnes were not only not supported by the evidence, but were disproved thereby. For example: Agnes did not prepare the will; it was merely a copy of the Van Hoomissen will with different beneficiaries, and Agnes copied it from the former will as altered by Fred and as slightly reworded by Mr. Linfoot. Agnes was not present when Fred and Mr. Linfoot discussed the new will; she was in Mr. Linfoot's outer office, while they were in his private office, with the communicating door closed. Fred, at the time of making his will, was not influenced by Agnes acting through Roy Damon; Damon did not appear upon the scene until much later.

■ When a fiduciary relationship existed between testator and beneficiary, and a will is executed which is unjust or unnatural in its terms, by favoring the beneficiary over persons who were the natural objects of the testator's bounty, then slight evidence that such beneficiary did exercise undue influence to bring about the execution of the will may be sufficient to invalidate it. *Greenwood v. Cline,* 7 Or. 17, 27; *In re Holman's Will,* 42 Or. 345, 358-359, 70 P. 908; *In re Diggins' Estate,* 76 Or. 341, 347, 149 P. 73; *In re Le Gault's Estate,* 99 Or. 621, 627, 196 P. 254; *In re Estate of Allen,* 116 Or. 467, 474, 241 P. 996; *Brumbaugh v. Barber,* 135 Or. 392, 399, 296 P. 42; *In re Brown's Estate,* 165 Or. 575, 584, 108 P. 2d 775; *In re Lobb's Will,* 177 Or. 162, 160 P. 2d 295, 304.

We do not find from the evidence that Fred Meier was a man who was easily persuaded against his will. Mr. Linfoot testified that at the time when the will

was executed he, Linfoot, had been acquainted with Fred and had been his neighbor for some five or six years. For several years he had acted as Fred's attorney. He was of the opinion that Fred was a man of strong will, and that, when he executed the will, he knew what he was doing with his property and had testamentary capacity. Mr. Van Hoomissen described Fred as "just a hard-working man; good, honest, hard-working man. There was nothing unusual about him, as compared to other people, I would never notice him being eccentric." Flavius Meier said that Fred "was a man that worked and saved and denied himself everything in order to accumulate wealth, which he thought was one of the superior parts of the whole. Of course, it was an illusion, but he pursued that objective and he was wise in investments." In response to a leading question by counsel for contestants, viz.: "He trusted whoever happened to be with him at the time?" he answered, "Yes. Yes." However, we do not gather from the evidence as a whole the impression that Fred was a gullible or easily led person.

██ It appearing that the testator had testamentary competency, and there being no satisfactory evidence of undue influence, it is our duty to uphold the will. *In re Ames' Will,* supra, 40 Or. 495, 499, 67 P. 737; *In re Holman's Will,* supra, 42 Or. 345, 356, 70 P. 908; *Wayne v. Huber,* 134 Or. 464, 491, 291 P. 356, 294 P. 590, 79 A. L. R. 1427.

██ Contestants say that they gave proof of the exercise upon the testator, subsequent to the execution of the will, of undue influence which prevented him from revoking the will. Such evidence, they say, was competent, as tending to show the influence of the person charged with procuring the will over the testator at

the time when the will was made. *In re Miller's Estate,* 31 Utah 415, 88 P. 338, 343. They say that such evidence was competent also to show that the testator was fraudulently prevented from revoking or changing his will. 57 Am. Jur., Wills, p. 260, § 353. The evidence upon which the contestants rely in this connection has to do with conduct of Agnes Meier Beal toward testator, through Roy Damon. Damon, at the time of the hearing, was 72 years old. He had been acquainted with Fred Meier for four or five years. Both of them had worked at the Oregon State Hospital, and they had become rather closely associated. Damon occasionally visited at Fred's home and, while so visiting, became acquainted with Agnes. On January 1, 1947, he made an agreement with Fred and Agnes under which he paid them $1,000 for a third interest in Fred's residence property. Thereafter, until Fred's death, he lived in Fred's house. Agnes and Damon became very close friends. She admitted that her husband objected strenuously to such friendship. Despite her husband's objections, however, she carried on a clandestine correspondence with Damon while she was living with her husband at Las Vegas, Nevada. She testified, however, that the relationship was strictly platonic. This was subsequent to the execution of the will. There was introduced into evidence a large number of letters written by Agnes to Damon in the course of this clandestine correspondence. Notwithstanding the great disparity between the ages of the correspondents (Agnes was about 33), the letters were extremely intimate and indiscreet in their language. Agnes testified: "We were all very plain spoken", and that undoubtedly was true. It seems incredible that Agnes was actually infatuated with Damon. It is more probable that she

was merely flattering his ego in order to use him as a cat's paw to further her interests with Fred. In one letter she asked him to act as her "faithful friend and watchdog", and use his influence with Fred "so he'll trust me and love me and not change things from the way they were." In another she said: "I hope you will use all of your influence so he will not change the will and leave everything as he originally had it."

Damon denied that he ever attempted to coerce Fred into letting the will stand. There is no evidence, in any event, that Fred ever had any intention of revoking the will. It remained in Fred's possession from the time of its execution, on November 12, 1938, until his death on October 12, 1947. During that period of some nine years he had every opportunity to revoke it or to alter it if he had desired to, but he refrained from doing so.

> "Undue influence which is not exerted until after the will is made does not affect its validity, even if such subsequent influence goes to the extent of preventing testator from revoking his will when he wishes to do so." 1 Page on Wills, Lifetime Ed., p. 388, § 191.

It is not necessary in the present case, however, to go so far. Here there was a total lack of evidence of *animus revocandi* upon the part of the testator.

■ Secrecy surrounding the making of the 1938 will is urged as tending to support the claim of undue influence. *Wolf v. Harris,* 57 Or. 276, 279, 106 P. 1016, 111 P. 54; *In re Rupert's Estate,* 152 Or. 649, 681, 54 P. 2d 274. What is meant is that the testator deliberately concealed from his children, and from his brother Flavius, who was named executor in the 1919 will, the fact that he had made a new will. As far as the children

are concerned, there is no evidence that the testator was accustomed to discuss his affairs with them. Flavius Meier testified that Fred felt hurt about the way his family, including the children, had treated him subsequent to the divorce. Fred lived in Salem, the children in Portland. Their contacts were infrequent. While, at one time, Fred and Flavius had been closely associated, by 1938, when the new will was executed, they were no longer on good terms. Under the circumstances, the fact that the testator did not inform either his children or Flavius about his 1938 will was not, in our opinion, secrecy in the sense of that furtiveness which may be one of the indicia of the exercise of undue influence.

We are of the opinion that the case was correctly decided by the trial court. The decree is affirmed. No costs will be allowed to any party.