Submitted on briefs July 2, affirmed September 17, petition for
rehearing denied October 15, 1958

IN THE MATTER OF THE ESTATE
OF WILLIAM A. REDDAWAY, DECEASED

329 P. 2d 886

411

412

Jack, Goodwin & Santos, of Oregon City, and Paul Wiggins, Portland, for appellants.

Sheldahl & Misko, of Oregon City, and Paul Gerhardt, Portland, for respondent.

O'CONNELL, J.

William A. Reddaway died on March 14, 1957 at the age of 68. He had executed a will on June 25, 1931, the original of which was destroyed under circumstances which will be later described. A copy of the will was admitted to probate on April 22, 1957 in the circuit court of Clackamas County. Dallas Reddaway and Dorlis Moore, son and daughter respectively of William by his first marriage, filed a petition contesting the will. The defendant Walter Reddaway, son of William by his second marriage, was designated as executor in the will. The contestants contend that William Reddaway had effectively revoked the will in question and that therefore the decedent died intestate. The proponent of the will, Walter Reddaway, contends that the original will was destroyed as a result of undue influence exercised upon William by Dallas, his wife Zena, and his mother-in-law, Golda Ritzau. If the will is sustained, Dallas and Dorlis will each receive $100 and Walter will receive the residue of the estate, the amount of which is not stated in the record, but which we may assume would be substantially more than his half-brother and half-sister would receive. On the other hand, if the will is not sustained and it is found that William died intestate, then the three children would share the estate equally. The lower court dismissed the contestants' petition and entered a decree confirming the 1931 will as the last will of William Reddaway.

The relevant facts are as follows: The decedent owned and operated a trucking business. His son Walter began working in the business as a truck driver at the age of 17. In 1939, when his father suffered a stroke, Walter took over the management of the business. Dallas also worked for his father, but only

during the period from 1941 to 1951. It is quite apparent that up until the last six months of William's life he relied upon Walter rather than Dallas with respect to both business and personal matters. Walter was constantly in touch with his father, particularly after his father's first stroke in 1939. Dallas was not a frequent visitor at his father's home until after the death of William's second wife, Ethel, in September 1956. After Ethel's death it was necessary to employ someone to take care of William, who was at the time almost helpless, due to a series of paralytic strokes. Golda Ritzau was employed as a practical nurse at a wage of $150 per month. She moved into the William Reddaway home on November 1, 1956. On January 3, 1957 the original of the will which William had made in 1931 was destroyed by Dallas at his father's request. On January 27, 1957, at William's direction, his attorney, George Hibbard, prepared another will, by the terms of which Walter, Dallas and Dorlis were to share equally in his estate, subject to a devise to Golda Ritzau of a life estate in the Reddaway home. When Mr. Hibbard brought the will back to William for execution, William refused to sign it because it named a bank as the executor, and William wanted Dallas to serve in that capacity. Further, he instructed Mr. Hibbard to increase Golda's share so that in addition to the life estate she would receive an annuity of $150 per month during her lifetime. This will was never executed.

We now turn to the specific facts which the proponent of the will alleges were sufficient to constitute undue influence. It is contended that the influence was exercised principally by Golda, but acting in concert with Dallas and his wife Zena. Most of the testimony relates to Golda's conduct in taking care of William

in the Reddaway home. Golda entered upon her employment as a result of the suggestion made by Dallas, although Walter agreed to it. Golda made it clear that she would expect to have complete charge. of her patient. There is clear evidence that after she took over there was a change in William's attitude toward his son Walter and toward others for whom he had previously indicated warm affection. There is evidence indicating that Golda did not want William to be left alone with others; that she spoke to him in affectionate terms, calling him "honey" and "dear"; that she dressed in a manner designed to excite his sexual appetite and "started * * * using an extreme amount of make-up." Walter testified:

"I went over one Monday earlier than usual and it was approximately eight-thirty. I walked in the house. Dad had red all over his lips. I inquired and asked him. I said, 'Where did you get the red lips?' Golda didn't give him a chance to answer, but she said, 'Oh, he has been eating prunes.' "

Golda kept a nurse's chart showing the condition and activity of her patient from hour to hour each day. An incident relating to the keeping of the chart is of particular significance. Five days after William had destroyed his will, Dr. Strickland, William's physician, was called to examine him, possibly at Golda's suggestion. When the examination had been completed Golda requested the doctor to record in her chart the result of his examination. He made the following notation: "Abdomen negative. Mind is clear, mentally alert. * * * Physically and mentally very good." This is the only notation in the nurse's chart made by anyone other than Golda. Dr. Strickland testified that he made the notation because Mrs. Ritzau said "that

there had been some kind of an upset between members of the family." The record does not disclose any evidence of a family upset at the time the notation was made. If an upset existed it would not have been over the destruction of the will, because at the time the notation was made, Walter did not know that the will had been destroyed.

The circumstances leading up to and attending the destruction of the will were as follows: Approximately two months after Golda began her employment in the Reddaway home, William requested that his will be brought to him. This request was made by way of a note which the contestants allege was written by William. The note was carried by Dallas to William's attorney. There was testimony that William was not able to write except "in case of someone holding his hand and guiding his hand." On a previous occasion William had signed some bonds by a mark because he could not sign his name. When the will was obtained it was handed to William. William then requested that Dallas read the will aloud. The contestants testified that William read the will. There is testimony that he was unable to read at this time. After the will was read, William said "No good." At William's request Dallas burned the will. The only persons present were William, Dallas, Zena and Golda. All of this occurred about midday. The only explanation for Zena's presence on this occasion was the fact that she had often accompanied her husband on his visits to his father. The attorney who drew the will was not present at the time the will was burned. According to the testimony of Zena, William said that "he felt good that it was burnt and thought that things had been made right that had been wrong for a number of years." The evidence is quite clear that William

was emotionally unstable, probably senile, during the period that influence was alleged to have been exerted.

When Golda had been at the Reddaway home but for a short period William's attitude toward Walter changed from one of warmth to coolness and reticence. As Walter put it, "It was a cold, cool feeling in the house when I would walk in." There is no substantial evidence to explain this change other than the influence exerted upon William by Golda, Dallas, and possibly Zena. As late as September 1956 William had assured Walter that the house would belong to him upon William's death. There is no evidence that Walter had done anything which would have caused his father to decrease the amount of his legacy under the original will.

■ There is evidence of other acts of participation in William's affairs by the contestants which suggests that influence was exerted upon him. William's personal mail which had always been delivered to the trucking company's office was ordered to be delivered to the Reddaway home. A diamond brooch and ring which had belonged to William's wife Ethel and which Walter had in his possession were called for by William, and when Walter failed to deliver them, Dallas asked him why he had failed to do so. It may be noted that Ethel was Walter's mother and the stepmother of Dallas. There are other facts in the record indicating the participation of Golda and Dallas which could be regarded as evidence of the exertion of influence upon William. We think that the evidence recited above is sufficient to establish that undue influence was exercised in this case. Although much of the testimony is conflicting, as is usual in cases of this type, we are of the opinion that the proponent has carried his burden of proof.

■ We shall now consider the principles of law which are applicable to the facts in this case. It may first be noted that in the usual case in which undue influence is relied upon as a basis of attack, the object of the suit is to set aside the will. In the instant case the object of the suit is to sustain the will, it being asserted that undue influence was exerted upon the testator so as to cause him to destroy his will. However, the underlying principle is the same. Briefly stated, that principle is that the law will not permit improper influences to control the disposition of a person's property. We speak of this in the law as "undue influence." The term, like so many other legal terms, cannot be specifically defined. A typical definition is found in *Porter v. United States National Bank of Portland,* 192 Or 483, 492, 235 P2d 894 (1951), where it was said:

"The theory which underlies the doctrine of undue influence is that the testator is induced by various means to execute an instrument which, although his, in outward form, is in reality not his will, but the will of another person which is substituted for that of testator. Such an instrument, in legal effect, is not a will at all. Although executed by the testator, his intention to make a will is so defective that the instrument is invalid."

This is simply a manner of expressing the idea that but for the wrongful influence exercised upon the testator he would not have executed the will. As pointed out by Mr. Justice ROSSMAN in *In re Kelly's Estate,* 150 Or 598, 617, 46 P2d 84 (1935), every will is the product of some kind of influence. It is the task of the courts to determine whether the influence in the particular case is "undue".

■ The definition set out above comes at the problem by considering the effect of the influencer's conduct

on the mind of the testator. Rather than approach the problem from the standpoint of the testator's freedom of will, it would be more profitable to focus the emphasis on the nature of the influencer's conduct in persuading the testator to act as he does. The question is, has the influencer by his conduct gained an unfair advantage by devices which reasonable men regard as improper? The idea is expressed in *Morris v. Morris,* 192 Miss 518, 6 So 311 (1942) where the court says that undue influence

> "denotes 'something wrong, according to the standard of morals which the law enforces in the relations of men, and therefore something legally wrong, something, in fact, illegal. * * * The nature of the influence can be judged only by its result. It is the end accomplished which colors the influence exerted, and entitles us to speak of it as wrongful, fraudulent, or undue, on the one hand, or as proper or justifiable on the other hand. * * * We are to understand the word "undue" as describing not the nature or the origin of the influence existing, nor as measuring its extent, but as qualifying the purpose with which it is exercised or the result which it accomplishes. * * *' "

It is not expected that all courts would hold to the same moral standard in appraising the influencer's conduct, and further, the consequences of upholding the influenced gift are important. It would be expected that there would be less concern with the influencer's motive in a contest between him and the state claiming by escheat than there would be in a contest between him and the donor's deserving spouse.

Definitions of undue influence couched in terms of the testator's freedom of will are subject to criticism in that they invite us to think in terms of coercion and duress, when the emphasis should be on the unfairness of the advantage which is reaped as the re-

sult of wrongful conduct. "Undue influence does not negative consent by the donor. Equity acts because there is want of conscience on the part of the donee, not want of consent on the part of the donor." 3 Modern L Rev 97, 100 (1939). Said in another way, undue influence has a closer kinship to fraud than to duress. It has been characterized as "a species of fraud."

■■ We shall now consider the application of the law more specifically as it relates to the facts recited above. We first consider the burden of proof. The burden of proving that the will was destroyed free from influence was on the contestants. This court has held that where a confidential relation exists between a testator and the beneficiary, slight evidence is sufficient to establish undue influence. *In re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858. The rule is more specifically stated in *In re Southman's Estate,* 178 Or 462, 482, 168 P2d 572 (1946), as follows:

"The existence of a confidential relationship * · * * when taken in connection with other suspicious circumstances may justify a suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference. * * *"

It will be noted that the burden does not exist unless there are circumstances in addition to the confidential relation. As was said in *Roblin v. Shantz, Executrix,* 210 Or 371, 378, 311 P2d 459 (1957), "We must be shown suspicious circumstances." Suspicious circumstances are abundant in the case at bar. We also find that there was a confidential relation between William and his son Dallas, and between William and Golda. The facts fall within the text stated by Mr. Justice LUSK in *Doneen v. Craven, Executor et al.,*

204 Or 512, 522, 284 P2d 758, because here the "relationship is such as to indicate a position of dominance by the one in whom confidence is reposed over the other." The record shows that during the crucial period immediately preceding and during the burning of the will, William was guided by the judgment and advice of Dallas with respect to a variety of matters, some of which have been recited above. The inference is strong that Golda participated in these activities. See *In re Estate of Elise Rosenberg,* supra.

It has been held that a confidential relation may exist between patient and nurse. *Hollon's Executor v. Graham,* Ky 280 SW2d 544 (1955); *Bolander v. Thompson,* 57 Cal App2d 444, 134 P2d 924 (1943); *Schwartz's Estate,* 340 Pa 170, 16 A2d 374 (1940); *Rich v. Hallman,* 106 Fla 348, 143 So 292 (1932); *Hyatt v. Wroten,* 184 Ark 847, 43 SW2d 726 (1931); *Mors v. Peterson,* 261 Ill 532, 104 NE 216 (1914). See also, Note, Undue Influence in Intervivos Transactions, 41 Col L Rev 712 (1941). For discussion of the Oregon cases see 1 Jaureguy & Love, Oregon Probate Law and Practice, § 316 (1958).

We shall now consider the factors of importance in determining whether undue influence was exercised upon the testator in the present case.

■ *Procurement.* One of the circumstances frequently relied upon in the cases as indicating improper influence is the participation of the beneficiary in the preparation of the will, or in its destruction, if it is urged, as here, that the destruction of the will did not revoke it. *In re Estate of Manillus Day,* 198 Or 518, 257 P2d 609 (1953); *In re Estate of Urich,* 194 Or 429, 446, 242 P2d 204 (1952); *In re Estate of Meier,* 190 Or 140, 149, 224 P2d 572 (1950). The participation may be through an agent. *Porter v. United States*

*National Bank of Portland,* supra; Atkinson on Wills, 2d Ed 1953, p 551.

In the instant case the participation of Dallas, Golda and Zena in the burning of the 1931 will and in the preparation of a new one is described above. Their activity manifested a concern over the disposition of William's estate which might well have been prompted by a selfish motive in view of the fact that the changes which were to be made in the new will would have increased their interests in William's estate. This motive may have caused them to improperly persuade William. The contestants had the burden of producing evidence that such persuasion was not used. They did not carry that burden.

■ *Independent Advice.* As stated by Mr. Justice McAllister in *Toomey v. Moore,* 213 Or 422, 325 P2d 805 (1958):

> "This court has uniformly held that it is the duty of a beneficiary who participates in the preparation of a will and who occupies a confidential or fiduciary relationship to the testator to see that the testator receives independent and disinterested advice.   *   *   *"

See also *In re Estate of Manillus Day,* supra, at 533.

William Reddaway had the benefit of the independent advice of his own attorney in drawing up the new will which would have benefited Golda, Dallas and Zena. It may be noted, however, that on the occasion of the first visit of William's attorney to discuss the terms to be included in the new will, and on the occasion of the second visit the following day when the new draft was delivered, Golda was present. Although there was the opportunity for independent advice under these circumstances it is quite possible that it would

not have been heeded. In this connection it is noteworthy that one day after William had outlined the terms of his will to his attorney, he instructed the attorney to increase Golda's share by adding the $150 monthly annuity referred to above.

■ *Secrecy and Haste.* Among the circumstances justifying an inference of undue influence is the "secrecy and haste attendant upon the making of the will." *In re Estate of Manillus Day,* supra, at 533. In the present case most of the events relating to the destruction of the old will and the making of the new one could be testified to only by Golda, Zena and Dallas. Walter was never informed of his father's plans. There was also testimony that Golda discouraged others from coming to the Reddaway home, and that when visitors came to see William she exercised a watchful eye during that time. Viewed together with the other facts in this case, we regard these as suspicious circumstances. *In re Kelly's Estate,* supra. See *In re Carson's Estate,* 74 Cal App 48, 239 P 364 (1925); cf *Harritt v. Linfoot, Executor,* 210 Or 354, 311 P2d 450 (1957).

■ *Change in Decedent's Attitude Toward Others.* The unexplained change in the donor's attitude toward those for whom he had previously expressed affection is evidence of improper influence. *In re Estate of Elise Rosenberg*; *In re Kelly's Estate,* both supra, and, *In re Rupert's Estate,* 152 Or 649, 54 P2d 274 (1936). The sudden change in William's attitude toward Walter has been alluded to above. Other friends of William testified that after Golda moved into the Reddaway home William became "cold" toward them. It is probable that Golda played a part in effecting this change of attitude.

■ *Change in the Testator's Plan of Disposing of*

*His Property.* In the case of *In re Estate of Elise Rosenberg,* supra, it was said at 196 Or 230:

"Among the circumstances to be considered in determining whether undue influence was exercised are a decided discrepancy between a new and previous wills of the testator; and continuity of purpose running through former wills indicating a settled intent in the disposition of his estate; and, the disregard of natural objects of testator's bounty. Newman v. Stover, 187 Or 641, 656, 213 P2d 137; In re Hart's Estate, [107 Cal App2d 60] 236 P2d 884; In re Walther's Estate, 177 Or 382, 397, 163 P2d 285."

The "variance" between the testator's first will and a later will was regarded as a "suspicious circumstance" justifying an inference of undue influence in the case of *In re Estate of Manillus Day,* supra, at page 533. See also *Harritt v. Linfoot, Executor,* supra, at 360; 1 Jaureguy & Love, Oregon Probate Law and Practice, supra, § 324.

Soon after Golda was employed at the Reddaway home William decided to reduce Walter's share in the estate, to increase Dallas' share, and to make a substantial bequest to Golda. Yet there was no evidence of estrangement between William and Walter as a result of Walter's conduct in his relation to his father.

■ *Unnatural or Unjust Gift.* A person may make a legally effective disposition of his estate which reasonable men would regard as unfair. He may favor his mistress over his wife, or he may disinherit a deserving son, and the law will not concern itself with his moral duty. *In re Estate of Riggs,* 120 Or 38, 241 P 70, 250 P 753 (1926). But if he does make an unfair or unnatural disposition it is a circumstance to be weighed in determining whether improper influence had been used. *In re Estate of Manillus Day,* supra, points out that

where a confidential or fiduciary relation exists and the will is unjust or unnatural, slight evidence of the exercise of undue influence may be sufficient to invalidate it. The "disregard of natural objects of testator's bounty" is listed as one of the indicia of undue influence in *Estate of Elise Rosenberg,* supra, 196 Or 219 at 230. See also *In re Estate of Meier,* supra, 190 Or 140 at 150; and 1 Jaureguy & Love, Oregon Probate Law and Procedure, supra, at § 323, where other Oregon cases are collected.

The record does not disclose the value of William's estate. Nor are we given the value of the share which Golda would have received had the new will been executed. Under the circumstances it seems unusually large in view of the short period of time that she was in attendance upon the donor. To make such a gift at the expense of a faithful son who has devoted a good share of his life to his father's business seems unnatural to us. The contestants urge that it is not unnatural for a person to dispose of his property as a result of the affection which he feels for the donee. We recognize that influence resulting from kindness and affection may not be "undue" under the proper circumstances. The rule is accurately stated in *Mac-Millan v. Knost,* 126 F2d 235 (1942) as follows:

> "Influence gained by kindness and affection will not be regarded as 'undue', *if no imposition or fraud be practiced,* even though it induce the testator to make an unequal  *  *  *  disposition of his property in favor of those who have contributed to his comfort  *  *  *  if such disposition is voluntarily made." (Italics supplied.)

The portion of the quotation in italics is important. It is the key to an understanding of the legal concept of undue influence. The word we stress here is "im-

position", as distinct from the word "fraud". Cf Green, Fraud, Undue Influence and Mental Incompetency, 41 Col L Rev 176 (1943). As we have stated above, in determining whether a gift is legally effective the law does not disregard the donee's purpose or motive in eliciting the donor's affection. See *Allen v. Breding,* 181 Or 332, 340 181 P2d 783 (1947). If it is established that the donee generated the donor's affection for him solely for the purpose of inducing a gift, a court will ordinarily find a way to deprive the donee of the fruits of his deception. Cf *In re Kelly's Estate,* supra. And fraud, in the strict sense, is not necessary. This is what we meant earlier in speaking of "unfair advantage".

Where there is a confidential relation between the donor and donee and the gift results in shunting the property away from those who had a reasonable expectation of being the recipients of the donor's bounty, the law places the burden on the donee to produce evidence that improper influence was not used. *In re Estate of Urich,* supra. When the transfer results in an unnatural distribution of the donor's estate "not in accord with the mores of the community", it is "searchingly questioned". See Note, Undue Influence in Intervivos Transactions, 41 Col Law Rev 707, 720 (1941).

*Donor's Susceptibility to Influence.* The physical and mental condition of the donor is regarded as a factor of importance in determining whether a disposition of property was the result of undue influence. In many of the cases the fact that the person alleged to have been unduly influenced was enfeebled in mind or body is pointed to as evidence that his free will had been affected. *In re Estate of Manillus Day,* supra, 198 Or 518 at 534; *In re Estate of Urich,* supra, 194

Or 429 at 448; and see Note, 50 Mich L Rev 748 (1952). And in the present case the contestants argue that since William Reddaway was a man of strong will as evidenced by various acts referred to by contestants, his mind was not overpowered by the influence exerted by others and therefore the influence was not "undue". As we understand undue influence, we need not find that the donor's mind is captured by another. The mental and physical weakness of the donor is merely a circumstance in determining whether the persuasion was improper and an unfair advantage resulted. It is apparent from the evidence in this case that William Reddaway's mental and physical condition made him an easy mark for one who might wish to influence him. We do not think that it is necessary to recite this evidence.

Although there is other evidence in the record which is relevant to the issue of improper influence, the combination of circumstances recited above is sufficient to sustain the proponent's claim that undue influence was exercised upon the testator in causing him to destroy his will. As this court has pointed out previously, cases of this type ordinarily must rest upon circumstantial evidence. See *In re Estate of Urich,* supra, at 445. We can only view the evidence from the bare record without the opportunity of watching the witnesses as they testify. The trial judge had this opportunity. He concluded that undue influence was exercised. We agree with him. The decree is affirmed.