Argued December 19, 1977, affirmed February 13, reconsideration denied
March 15, petition for review denied May 31, 1978

SMITH et al, *Appellants,*

*v.*

FIRST NATIONAL BANK OF
OREGON et al, *Respondents.*

(No. E 2012, CA 8651)

574 P2d 703

Francis F. Yunker, Portland, argued the cause and filed the briefs for appellants.

Robert E. Thompson, Beaverton, argued the cause for respondents The First National Bank of Oregon, Executor of the Will of Beulah M. Glasner, and The First National Bank of Oregon, Trustee. With him on the brief was Thompson, Adams, Lund & DeBast, Beaverton.

No appearance for respondent American Cancer Society.

Before Schwab, Chief Judge, and Tanzer and Buttler, Judges.

BUTTLER, J.

**BUTTLER, J.**

This proceeding is one to contest the will of Beulah Glasner, on the grounds that decedent lacked testamentary capacity, was acting under undue influence and labored under an insane delusion regarding her daughter. Contestants are the daughter and grandchildren of decedent, and they appeal from an adverse judgment.

The decedent and her husband Clarence lived most of their lives in North Dakota; in 1974, after Clarence's retirement, they moved to Oregon where their only child, Arlene, was living with her three children. The record indicates that the family relationships had been good. Shortly after arriving in Oregon, Clarence learned that he had cancer, and on April 16, 1975, the Glasners executed reciprocal wills (Will I), in which each left everything to the survivor, but if there was no survivor, then to daughter Arlene.

In June of 1975, after the execution of these wills, Beulah was admitted to St. Vincent's Hospital where she was treated for acute cystitis and nervous exhaustion. She also consulted Dr. Bowerman, a psychiatrist, whose final diagnosis was that decedent was suffering from pseudoneurotic schizophrenia. She left the hospital on June 14, 1975. Dr. Bowerman testified at trial that persons afflicted with pseudoneurotic schizophrenia are able to function well most of the time, but may have "periods when they don't think very well and may be frankly paranoid as opposed to schizophrenic."

Decedent continued to consult Dr. Bowerman for a short time after she left the hospital. In the meantime, Clarence's condition deteriorated, and he died in August, 1975.

In 1972, Arlene was divorced form her former husband. Concerned about his daughter's financial welfare, Clarence purchased 23 Series H United States Bonds of $1000 denominations during 1972 and 1973, making them payable to himself or his daughter,

[ 567 ]

Arlene. While the evidence is conflicting as to whether Arlene was aware of their purchase, it is clear that her new husband learned of them when he witnessed the April 16, 1975, wills.

When Clarence became ill, he proceeded to cash the bonds; Arlene had remarried, and he thought they were no longer needed for her protection. Three days before his death, Clarence executed a power of attorney for the purpose of authorizing decedent to cash the ten remaining bonds herself, but she was unable to do so before Clarence died. Because she believed her husband wanted her to have the proceeds of the bonds, decedent, on the advice of her attorney, treated the bonds as an estate asset.

Within a few days after Clarence's death, a dispute arose with respect to the bonds, resulting in Arlene's retaining an attorney who demanded the bonds, together with evidence that only ten of the original 23 or 24 remained in joint ownership. On September 22, 1975, Beulah executed a new will (Will II), in which she mentioned, but disinherited, her daughter, and left her entire estate in trust for her grandchildren. The attorney who prepared that will testified that decedent was very hurt and upset by her daughter's attitude and conduct; he also testified that decedent had mentioned that Arlene's new husband had a criminal record (for which there was no basis in fact). That attorney further testified that decedent indicated she would probably change the will, that she did not want to give large amounts to her grandchildren because she thought that by doing so she would benefit Arlene. Decedent said she was going on a trip to the Midwest to visit relatives, after which she would decide what she wanted to do. At the trial, counsel for contestants, in examining the attesting witnesses to Will II, established the validity of that will.

Decedent went on her planned trip to the Midwest, and when she returned, Arlene filed a lawsuit against her on January 16, 1976, claiming ownership of

$24,000 worth of bonds. On January 21, decedent executed a new will (Will III) in which she made 34 specific bequests to friends, relatives, acquaintances and charities, some of whom she hadn't been in contact with for over 40 years, totalling $85,000. The residue of her estate was left to her grandchildren. That same day, she was admitted to the hospital for an abdominal ailment diagnosed as terminal cancer. On February 10, 1976, decedent executed a codicil to Will III, adding six specific bequests of $1000 each. She died April 8, 1976. It is Will III, and codicil thereto, which are in contest.

■  On this appeal, contestants do not contend seriously that decedent lacked testamentary capacity to execute any of the three wills or codicil. The evidence to the contrary is overwhelming, in spite of decedent's psychological problems. It is possible, however, for a person to possess testamentary capacity in the general sense and yet be so obsessed by delusions that the resulting will is void as not being the product of a sound mind. There is uncontradicted evidence here that decedent, at least subsequent to the death of her husband, told others that her daughter and her husband were going to kill her, and that she was so convinced of that fact that she changed the locks on her doors. Such a belief, totally without foundation in fact, might be sufficient to invalidate a will disinheriting the daughter. *Hofen v. U. S. National Bank et al,* 215 Or 603, 335 P2d 86 (1959).

However, it is clear from this record that the dispute over the bonds was at least among the reasons for decedent's executing Will II. It makes no difference who was legally correct in that dispute; the fact is that the dispute did occur and was a running dispute from August, 1975, until decedent's death, and decedent's reaction thereto was not a delusion. It was in Will II that the die was cast with respect to Arlene's disinheritance; neither Will III, nor the codicil thereto, changed vis-a-vis Arlene. If decedent had been swayed by insane delusions, then Will II would be void; however,

as pointed out above, contestants proved that will in their case in chief.

While it is true that the bequests to the grandchildren contestants decreased substantially from Will II to Will III, there is no contention that decedent entertained any delusions with respect to any of them. The changes in the will were consistent with statements made by decedent to the attorney who prepared Will II for her. Accordingly, Will III and the codicil thereto, are not the result of an insane delusion.

■ Contestants finally contend that Will III was the product of undue influence in one or both of two respects. First, it is argued that the "erroneous" advice given decedent by her first attorney with respect to the bonds materially affected the otherwise favorable disposition of mother to daughter, and effectively overcame the mother's will. No authority is cited for such a proposition. We need not decide whether such a circumstance may void a will where the malefactor does not gain thereby, because the record indicates that the attitude and conduct of the daughter and her attorney with respect to the handling of the bond dispute added so much fuel to the fire that we cannot say that factor was not as much a cause as the advice of decedent's counsel which triggered the dispute. It may be concluded reasonably that if Arlene had not said she did not believe her mother, but had been more solicitous of her mother's situation at a very difficult time for her, the result might have been different in spite of what appears to be erroneous legal advice to the decedent.

■ Second, contestants contend that a Mr. and Mrs. Olson, who receive $5000 under Will III, bore a fiduciary relationship to decedent, as a result of which the burden of proof shifted to proponents to show there was no undue influence. Assuming the relationship rose to that of a fiduciary, that alone is not enough to shift the burden: there must also be suspicious circumstances. *In re Reddaway's Estate,* 214 Or 410, 329 P2d

886 (1958). There is no evidence that Mr. or Mrs. Olson suggested a new will or that either selected a new attorney for decedent. The most that is shown is that Mrs. Olson stood behind decedent when she called her new attorney to list the numerous specific bequests, decedent having requested that she do so to help make certain she didn't miss anyone or anything on the list. In addition, Mr. and Mrs. Olson were attesting witnesses to Will III in decedent's attorney's office, and to the codicil (from which they gained nothing) in the hospital. Since the Olsons were old friends of decedent and had come to live with her and take care of her when she asked them in early January, 1976, it is apparent that the relatively small bequest to them was made in appreciation of their help.

Affirmed.