Argued and submitted May 2, affirmed December 14, 1994

Kenneth L. REA,
Personal Representative of the Estate of
Etta Mae Paulson, Deceased,
*Respondent,*

*v.*

Larry L. PAULSON,
*Respondent,*

*and*

Rita BRADY,
*Appellant.*

(89-2047; CA A80982)

887 P2d 355

Harold L. Olsen argued the cause for appellant. With him on the briefs was Olsen, Huffman & Horn.

Stephen D. Petersen argued the cause for respondent Kenneth L. Rea. With him on the brief was Petersen & Reed, P.C.

No appearance for respondent Larry L. Paulson.

Before Deits, Presiding Judge, and Haselton, Judge and Buttler, Senior Judge.*

BUTTLER, S. J.

---

* Buttler, S. J., *vice* Riggs, J.

## BUTTLER, S. J.

Plaintiff (Ken Rea), as personal representative of his mother's estate, brought this action to set aside a deed from his mother to defendant Paulson (Larry), a son of decedent by a second marriage, and a deed from Larry to defendant Brady executed after this action had been commenced. Brady, in turn, filed a cross-claim against Larry for damages in the event plaintiff prevailed in setting aside the deed to him. The trial court, sitting in equity, found in favor of plaintiff on his complaint, and in favor of Brady on her cross-complaint. Brady, alone, appeals from the resulting judgment.

■　　Appellant's first assignment of error is that there is insufficient evidence to support the trial court's findings. Although we review *de novo*, we defer to the trial court's determination of credibility when there is a conflict in the evidence, as there is here. We find the facts, which are consistent with those of the trial court, to be as stated in this opinion.

Decedent died on January 31, 1988, leaving four children: Ken, Donald, Barbara and Larry. She had purchased a home in Rainier, the property that is the subject of this lawsuit, in 1983, for $21,300.[1] At that time, she had a will that she had executed in 1967, leaving all of her property to her four children in equal shares. That will was never changed. After she moved into the house in Rainier, Ken and his wife, and Barbara and Don, helped decedent, who suffered from arthritis in both hands, renal failure, congestive heart failure and diabetes, as a result of which she had trouble getting around and, during the last part of her life, used an electric cart. She was taking several medications, including Prozac, Prednisone, Zantac and Procardia, and was receiving insulin daily and dialysis an average of three times a week. Although there is no evidence that she was mentally incompetent, the medications and treatments made her drowsy, tired and depressed, and caused mood swings. It is undisputed that she was dependent on the help of others in her daily living.

Larry was not in the Rainier area when his mother moved there and did not visit her. The other children and her

---

[1] Larry sold the house to Brady in 1989, after this lawsuit was filed, for $11,500, at which time its assessed value was $21,300.

neighbor helped her. The other children re-roofed the house for her, picked fruit and stored it and mowed the lawn; her daughter helped her with her finances and had a joint account with her, which the daughter never used. All of those children visited her frequently, and at least one of them saw her every day. Decedent expressed concern about losing the house because of her medical bills, and suggested that she put the house in Ken's name; he and Barbara looked into the situation and concluded that it was not necessary, and so advised their mother. At some point, it is not clear when, Larry was told by state welfare authorities, as Ken and Barbara had learned, that so long as his mother maintained her house as her primary residence and was not receiving Medicaid, she was not in danger of losing her house to the state. There is no evidence that decedent was receiving Medicaid, although she did receive Social Security benefits and Medicare.

Some time in early 1987, Larry and his then girlfriend (later his wife) moved in with decedent and took over her care. Larry expressed his concern to his mother that the state might take her house. Not long thereafter, Larry rented a house in Longview in his name and persuaded his mother to move in with him, his girlfriend and her child. After decedent moved to Longview, she rented her house in Rainier; the rent was used to maintain the house in Longview. At that time decedent had a savings account with approximately $2,000 in it; Larry held his mother's power of attorney. At the time of her death in January, 1988, that account was exhausted, although her medical expenses were being paid by Medicare. Larry admitted that he used some of that money to buy a bicycle and a guitar. He had also used her credit card, on which there was a substantial balance after her death, which he did not pay. He said that that debt "died with his mother." On numerous occasions, Larry expressed to his mother his concern that the state would take her house if she kept it in her name. She was fearful of that, in spite of what she had been told by Ken and Barbara. Larry told her that they were wrong, and frequently urged her to make up her mind "about the deed."

Decedent was hospitalized three times during 1987: February 13 to 18, August 2 to 10 and November 11 to 30. She

was in a nursing home following her first hospitalization and again shortly before her death.

Finally, on September 30, 1987, Larry suggested to his mother that they go to a title company in Rainier to get a deed. He took her, along with his then wife and her child, to the title company where he obtained a statutory form of warranty deed and filled it out in his handwriting, using the property description provided by the title company. For no explained reason, he then drove to Longview to a notary public, where decedent signed the deed after the notary explained to her that when she signed it she would be giving up all of her rights in the property. Larry then had it recorded on October 22, 1987. He did not mention it to any of his half-brothers or half-sister until two months later when he boasted of it to his half-sister.

■ Clearly, decedent had trust and confidence in Larry and was completely dependent on him in her daily life. He helped her with her finances and held her power of attorney. She was unable to write checks; Larry wrote them for her, and "she signed them as best she could." She was unable to come and go as she wished; after she moved in with Larry, she depended on him to take her places. Because Larry made it clear to decedent's other children that they were not welcome in his home, he succeeded in driving a wedge between them and their mother, with whom they had had a very close relationship until he appeared on the scene and took control of her life. He did not advise them of her death. We conclude that there was a confidential relationship between decedent and Larry and that, under the circumstances, he held a position of dominance over her; he was, literally, in the driver's seat. *In re Reddaway's Estate*, 214 Or 410, 329 P2d 886 (1958).

■ Although one who claims that another has asserted undue influence has the burden to prove it, an inference of undue influence arises when, in addition to a confidential relationship, there are suspicious circumstances. *In re Reddaway's Estate, supra*, 214 Or at 420. That inference, if unexplained, may be sufficient, although the burden of proof remains with the one asserting undue influence. *In re Reddaway's Estate, supra*. Circumstances that give rise to suspicions of undue influence are set out in *In re Reddaway's*

*Estate, supra*, and several are present here. Larry took his mother to the title company in St. Helens, where he procured the deed, filled it out in his own handwriting and then took his mother to Longview, where she signed it before a notary public. He not only procured the deed, he also participated in its preparation. Although he contends that it was his mother's idea, if it was, it was the result of his having persuaded her that she would lose the house if she did not deed the property to him, and of his repeatedly telling her to make up her mind "about the deed." At that time, Larry knew that the state would not take her home away from her as long as it was her primary residence, even if she was receiving Medicaid. Therefore, his persistence in raising the question was false, and he knew it was false. He did not argue that, because the Rainier house was no longer her primary residence, there was a risk that the state would take it. That argument would have been disingenuous, given that it was he who had suggested that she rent her house and move in with him.

Another important factor is the absence of independent advice. Although Ken and Barbara had advised decedent long before the deed was executed that she would not lose her house to the state if she maintained it in her name instead of deeding it to Ken, as she was contemplating at the time, Larry had persuaded her that Ken was wrong and that she should deed it to him. Under the circumstances, independent advice was essential, and Larry breached his fiduciary duty to her by not seeing to it that she get independent advice.

We also consider the change in attitude of decedent toward her other children after Larry took charge of his mother. Larry conceded that he had little good to say to his mother about his half-brothers and half-sister. More than that, the record shows that he told them that they were not welcome at his home, and that when Barbara tried to call her mother on the telephone, he would get on another line to interfere with the call. As a result, the relations between decedent and her other children deteriorated after Larry took over the care of their mother.

We have no reason to doubt that decedent was grateful to Larry for his having helped her during her final days, or that she loved him. However, the circumstances leading up to

the conveyance, and the preparation and signing of the deed, lead us to conclude that it was the product of undue influence exerted by Larry on his mother.

■ Appellant's second assignment of error raises the same question as does her first assignment. In her third assignment, she contends that the trial court erred in denying her motion for a new trial because of irregularity in the proceedings and because of the trial court's abuse of discretion, which prevented her from having a fair trial. ORCP 64B; ORCP 64C.[2] Trial was held on July 10, 1991, and the court rendered its decision by letter dated December 2, 1992, almost 17 months later. Appellant argues that the lapse of that much time rendered the facts stale, making it difficult for the court to remember them. As a result, she contends that the proceedings were irregular and that rendering a decision after that length of time amounted to an abuse of discretion requiring a new trial.

Although the time lapse between trial and decision was unusually long, a circumstance that we do not condone, the trial judge explained in his letter decision that he had

---

[2] ORCP 64B provides:

"A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following causes materially affecting the substantial rights of such party:

"B(1) Irregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having fair trial.

"B(2) Misconduct of the jury or prevailing party.

"B(3) Accident or surprise which ordinary prudence could not have guarded against.

"B(4) Newly discovered evidence, material for the party making the application, which such party could not with reasonable diligence have discovered and produced at the trial.

"B(5) Insufficiency of the evidence to justify the verdict or other decision, or that it is against law.

"B(6) Error in law occurring at the trial and objected to or excepted to by the party making the application."

ORCP 64C provides:

"In an action tried without a jury, a former judgment may be set aside and a new trial granted on motion of the party aggrieved on any grounds set forth in section B of this rule where applicable. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

made extensive notes during trial and that he considered it necessary to do some research before rendering a decision. It is apparent from his letter decision that he had a firm grasp of the facts and that he had done some research. In any event, we review *de novo* and find the facts to be essentially as the trial court found them. There was no error in denying appellant's motion for a new trial.

Affirmed.