was no exception to the charge, or any request by the defendant to the court to charge which was refused.

The defendant was a lawyer, and told his own story to the jury, and so far as there was a question of fact raised by his denial of the testimony offered for the prosecution the jury decided against him. An examination of this testimony entirely satisfies us that the verdict of the jury was correct, and that the defendant was guilty, and we are convinced that the jury could have arrived at no other conclusion upon any fair and intelligent consideration of the testimony.

The defendant has asked for a reversal because of certain alleged errors in the receipt and exclusion of testimony in regard to the witnesses produced by the defendant as to his character. We have examined all those rulings, but none of them would justify a reversal of the judgment. Most of the questions which were objected to and allowed were rendered clearly competent by the nature of the direct examination of the character witnesses, or by the testimony of the defendant himself on the stand. We think it entirely clear that the defendant had a fair trial, that all his rights were properly preserved, that the testimony overwhelmingly established his guilt, and that there was no ruling on the trial which would justify a reversal.

Entertaining this conviction, it follows that the judgment appealed from is affirmed. All concur.

---

In re IRVING'S WILL.

(Supreme Court, Appellate Division, First Department. December 13, 1912.)

1. WILLS (§ 288*)—VALIDITY—EXECUTION.
     That a testator could read and write does not of itself invalidate a will signed by him by making his mark, but places upon those taking substantial interests the burden of explaining the method of signing; and if the circumstances are not satisfactory it will be conclusively presumed that the mark is not the subscription of the testator.
     [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 651, 652, 662, 664; Dec. Dig. § 288.*]

2. WILLS (§ 302*)—VALIDITY—EXECUTION—EVIDENCE—SUFFICIENCY.
     In a proceeding for the proving of a will, executed by the testator by making her mark thereto, evidence *held* sufficient to establish that the will was signed by the testator and properly published as such.
     [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 575, 581, 700–710; Dec. Dig. § 302.*]

     McLaughlin and Miller, JJ., dissenting.

Appeal from Surrogate's Court, New York County.

In the matter of proving the last will and testament of Mary Irving, deceased. From a judgment of the surrogate admitting the instrument to probate, the contestant appeals. Affirmed.

See, also, 137 N. Y. Supp. 1123.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Harry Weinberger, of New York City, for appellant.
Raymond Ballantine, of New York City, for respondent.

DOWLING, J.　Mary Irving, employed as a chambermaid at the Woman's Hospital, in New York City, died after a brief illness on February 10, 1912, leaving a last will and testament whereof her friend, Mary Galvin, was executrix, and by which, after the payment of her debts and funeral expenses, the residue of her estate was left to said Mary Galvin "in appreciation of all her kindnesses to me during my life." The will was witnessed by Adelaide Galvin (daughter of the legatee) and J. E. Brown, and, as decedent signed by her mark, it was witnessed by the notary who had drawn the will, W. J. Dargeon. Decedent left a sister, Delia Ogg, an incompetent, who for many years had been an inmate of the Hudson County Insane Hospital at Jersey City, N. J., and the latter's daughter, Hazel I. Ogg.

[1] The testimony of the subscribing witnesses is ample to warrant the admission of the will to probate, and no possible question could be raised as to its validity, were it not for the fact that decedent, who could read and write, did not sign her name thereto, but simply made her mark. This does not of itself invalidate the will. A testator who desires so to do may make his mark, adopting that as his signature, and it thereupon becomes his signature within the meaning of the statute. Jackson v. Jackson, 39 N. Y. 153. But where one who can write has not signed his name to his will, but has instead thereof made his mark, and those taking substantial interests under the will are instrumental in obtaining it, while other interested persons act as witnesses to the signature, clear and satisfactory evidence is required to meet the burden of proof; and if the circumstances are not satisfactorily explained, they may justify a conclusive presumption that the mark is not the subscription of the testator. Underhill on Wills, vol. 1, p. 255. The reason of this requirement is obvious, having in mind the impossibility of determining, by comparison with other standards, whether a mark is genuine or not, as may be done with signatures.

[2] In this case, however, the burden has been fully sustained by the proponent. The notary who drew the will is not related to the parties to the controversy. The proponent had nothing to do with its execution. Her daughter, with whom decedent had been on intimate terms of friendship, and to whose mother's home she resorted, and where she stayed when out of employment, had been questioned by decedent about the way to go about making her will, and had introduced her to the notary, Dargeon, who was also an undertaker. His place of business was between the hospital and the Galvin home, the two places where decedent spent her time. There was nothing unusual in the will not having been drawn by a lawyer, for experience demonstrates that many wills in this city, as well as leases and deeds, are drawn by notaries. The decedent advised with Dargeon in private on this occasion, some two or three weeks before its execution, as to her proposed will. When she finally called to execute it, on February 3d, a week before her death, she gave him privately the specific instructions as to her desired disposition of her estate, and said she

wanted everything she possessed to go to her friend, Mary Galvin, in return for what she had done for her in the past, as no other person was nearer or dearer to her. At that time she told Dargeon she was in a state of excitement, felt very nervous, and would sign the will by making her mark. He knew then that she would make her mark and drew the attestation clause accordingly. She paid the notary for drawing the will. When the will had been drawn, it was read aloud by Dargeon, and signed by decedent making her mark in the presence of Dargeon and the two witnesses. She declared it to be her will, and requested the witnesses to sign their names thereto, and they did so sign in her presence and in the presence of each other. This is established by the testimony of Adelaide, Galvin, Joseph E. Brown, and William J. Dargeon. There is no testimony of any kind to contradict it, save that of Anna Gallagher, a maid at the hospital, who on her original examination swore that decedent was working at the hospital on the day the will was executed (which no one denied), and gave no testimony as to anything which happened on that day bearing on the disputed issue, but when recalled, some three days afterwards, undertook to swear that on the day in question decedent, who roomed with her, had never left the hospital in the evening, and that about 7 o'clock the witness went out to get some cheese sandwiches, and upon returning found decedent (who was her roommate) still in the room, and that after they had eaten the food they sat up and read until 10 o'clock, when they retired.

The testimony of the witnesses established the execution of the will by decedent between the hours of 8 and 8:30 in the evening. A careful reading of the testimony of Anna Gallagher leads to the conclusion that, as she admittedly had been accustomed to get cheese sandwiches on Saturday evenings and eat them in the company of the decedent, she simply confused the evening in question with others. Her cross-examination and that by the surrogate sufficiently disclosed the infirmity of her memory, even as to happenings on the day preceding her giving the testimony in question. Moreover, in rebuttal two witnesses were produced, William Fried and Margaret F. Tully, neither of whom was related to proponent, and both disinterested, who swore that they saw decedent at the Galvin home on the evening of February 3d, after 7 o'clock, before she went to the notary's office, thus conclusively demonstrating the mistake made by Anna Gallagher as to the presence of decedent in the hospital at that time.

It is significant that the witness Dargeon swears that when decedent made her mark it was done so faintly that he requested her to make it heavier and she retraced it. When the contestant produced the record of the Woman's Hospital, it was found that decedent had written her name in pencil; but it evidently was done weakly or faintly, for the historian of the hospital wrote it over in ink. This was some two months before she died. It is not unnatural for persons in the position of decedent to experience some nervousness at the thought of executing a formal document, which assumes still greater importance when presented to one who has not been accustomed to business affairs. While decedent could read and write, no letters of hers to any

one were produced. She was apparently in good health; but, in view of the early occurrence of the fatal attack, she may well have suspected her dangerous condition. In any event, the testimony amply warrants the conclusion that for reasons which she deemed sufficient she chose to make her mark upon her will, instead of affixing her signature, and that the will was executed in full compliance with every requirement of law.

There is no proof of any undue influence exerted upon testator, nor was her will an unnatural one for her to make. Her only next of kin was her sister, who for 20 years had been hopelessly insane, and who had been continuously confined in a public institution. Decedent visited her two or three times a year, but had never contributed anything to her support, evidently feeling that she was receiving proper care, and that money could not be expended in such a way as to benefit her. That sister's daughter testified that she had not seen her aunt in 17 years. When decedent signed the roll in the hospital, she answered the question, "Name and address of nearest relative or friend," by giving the name Mrs. Galvin, and the address she gave as her own was that of Mrs. Galvin. There was no more natural thing for her to do than to leave what little estate she possessed to that friend, in whose household were the only friends she apparently had, and who furnished her with the only substitute for a home to which in her loneliness she could go.

The decree admitting the will to probate should be affirmed, with costs to the proponent.

INGRAHAM, P. J., and LAUGHLIN, J., concur.

McLAUGHLIN, J. (dissenting). On an appeal from a surrogate's decree admitting a will to probate the Appellate Division should consider the whole evidence de novo. Matter of Brunor, 21 App. Div. 259, 47 N. Y. Supp. 681. In such consideration it has the same power to decide questions of fact which the surrogate had (section 2586, Code of Civil Procedure), and, if in doubt whether the will were duly executed, to set aside the probate and direct a trial of the issues before a jury (section 2588, Code of Civil Procedure; Matter of Manton, 32 App. Div. 626, 52 N. Y. Supp. 511; Howland v. Taylor, 53 N. Y. 627).

After a careful consideration of all the evidence taken by the surrogate, I think there exists a doubt sufficient to justify the court in setting aside the probate and sending the matter to a jury to determine whether the will in question were ever signed by the testatrix. At the time of her death she was over 21 years of age. The will is alleged to have been made on the 3d of February, 1912, and she died suddenly on the 10th of that month. Prior to her death she had enjoyed good health, was a person of strong mind, at least ordinary intelligence, could read and write, and properly manage her own affairs. Her only immediate relatives were a sister, in an insane asylum, and a niece, neither of whom were in any way mentioned or referred to in the will. After her sister was confined in the insane asy-

lum, she visited her several times a year and was solicitous as to her care and comfort. The executrix and sole beneficiary under the will is Mary Galvin, not a relative, and the only connection which the testatrix is shown to have had with her is at most when out of employment, boarding at her house, for which it is fair to infer from the record she paid. One of the subscribing witnesses is Adelaide Galvin, daughter of Mary Galvin, and the other is Joseph E. Brown, the daughter's intimate friend, and the person who drew the will is an undertaker who had been on terms of intimacy with the subscribing witnesses and Mary Galvin for many years. The will purports to have been signed by the testatrix making her mark. The attestation clause so recites, and both of the subscribing witnesses testified she signed in that way.

It may be in the city of New York that wills are frequently drawn by undertakers, who happen to be notaries public; but when a person of ordinary intelligence, who can read and write, signs such will by mark, the court should require some reasonable explanation why that course was adopted. A forged signature, in most cases, can be detected; but a signature by making a mark, if a forgery, is almost impossible of detection. It is for this reason, in the latter case, where the witnesses to such mark are interested by taking a substantial interest, or are the intimate relatives or intimate friends of those who do, that very clear and satisfactory evidence is required to establish the validity of the mark. Underhill on Wills, vol. 1, p. 255.

Such evidence, I think, was not here given; on the contrary, the same is far from convincing, and, as it seems to me, bears evidence of being manufactured. The testatrix, at and immediately prior to her death, was employed as a chambermaid at the Woman's Hospital, in the city of New York. Just how long she had been there employed does not appear, but it is fairly to be inferred for some considerable time, on account of the intimacy she had with other employés. Anna Gallagher, another employé of the hospital, who for eight months immediately prior to the testatrix's death had roomed with her, testified that she was not out of the hospital on the evening the will is alleged to have been made. And from her testimony and the testimony of the witness Lindsay, also an employé of the hospital, it seems incredible that the testatrix could have been absent from the hospital for such a length of time as that stated by the subscribing witnesses, and especially that of Galvin.

The genuineness of the mark is not only doubtful, but the testimony of the subscribing witnesses, as well as that of the one who drew the will, tend in no small degree to increase the doubt. The witness Galvin testified that the testatrix, some three weeks prior to the making of the will, asked her about it; that she stated she did not know, but would ask her personal friend, Mr. Brown; that Brown told her to take the testatrix to Dargeon; that she introduced the testatrix to Dargeon, and they had a talk; that the testatrix then asked the witness if she could not get Mr. Brown as a witness; that on the evening the will was executed the testatrix was at Galvin's house; that nothing was there said about the will, but in walking home with her

the testatrix asked "if we would attend to that little business that evening, * * * and I told her * * * I would be perfectly willing to go in the evening, and we went"; that they thereupon went to Dargeon's office, and met Dargeon and Brown; that, before the testatrix made her mark, Dargeon read the will and then handed it to her; that she took it, made her mark, and then asked her and Brown to sign as witnesses, which they did. Brown testified that he was at Dargeon's office when the witness Galvin and the testatrix arrived, and that the testatrix and Dargeon went into a rear office for a short time, and then Dargeon went upstairs to another office, where the will was drawn; that, after he had drawn it, Dargeon came downstairs, and at the testatrix's request read it to her in the presence of both witnesses. Dargeon testified that he first met the testatrix two or three weeks before the will was drawn; that she was brought to his office and introduced by the witness Galvin; that he took her to the rear office, and she then told him she had some money in the bank and would like to make some disposition of it in case of her death; that he told her she could do it by having it transferred in the bank or making a will, and she said she preferred making a will; that she asked him if he would draw it for her, and he told her he would at any time convenient for her; that he drew the will on the evening in question, and when pressed on cross-examination as to why he had stated in the attestation clause that it was signed by mark, he replied that when she told him how to prepare the will she said that she would sign in that way, because "I am in a state of excitement and feel very nervous."

So that we have a person of full age, accustomed to reading and writing, of ordinary intelligence, in the habit of transacting her own business, making deposits in the bank, and writing her own signature, in good health, going deliberately to an undertaker to have her will prepared and executed, and stating in advance of the execution that she will sign the same by making her mark, and the only excuse she gives for so doing is that she is in a state of excitement and feels very nervous. This is not the kind of proof which the law requires to explain why a person who can write signs a will by mark, and especially so when the relation of the subscribing witnesses and the person who drew the will to the sole beneficiary, who is in no way related by blood, is considered. Not only this, but the person who drew the will was a comparative stranger, whom she had never met but once before, and in whose custody she left the will after it was executed, and where it is claimed it remained until after she died. I cannot help but feel, under such circumstances, that property ought not to be taken from those who would otherwise inherit it, at least until a jury has passed upon the question.

For these reasons I am unable to concur in the opinion of Mr. Justice DOWLING, and vote to reverse the decree of the surrogate, to the end that the matter may be submitted to a jury.

MILLER, J., concurs.