Argued and submitted April 1, 1984, reversed and remanded with instructions November 20, 1985, reconsideration denied January 24, petition for review denied March 4, 1986 (300 Or 563)

In the Matter of the Estate of
Annie Mae Harris, Deceased.

WILLIAMS,
*Appellant,*

*v.*

OVERTON,
*Respondent.*

(137 096; CA A29193)

709 P2d 1115

Ben C. Fetherston, Jr., Portland, argued the cause for

appellant. With him on the brief were John J. Haugh and Haugh & Foote, P.C., Portland.

Rodney E. Lewis, Jr., Portland, argued the cause for respondent. With him on the briefs was Ragen, Roberts, O'Scannlain, Robertson & Neill, Portland.

Ferris F. Boothe, Portland, filed a brief *amicus curiae* for himself.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Contestant in this will contest appeals from a judgment of the probate court admitting testatrix's will of January 15, 1982, to probate in solemn form. He contends that the proponent failed to sustain her burden of proving that decedent had executed that document or, if she did, that she did so with intent to authenticate it as her last will and testament. He also contends that the will was the product of undue influence.

**1.** At the outset, we dispose of proponent's contention that we may no longer exercise *de novo* review in will contests. We have decided that, notwithstanding the amendment of ORS 113.055(4) by Oregon Laws 1979, chapter 284, sections 104 and 105, we continue to exercise *de novo* review in will contests. *Sanders v. U. S. National Bank,* 71 Or App 674, 694 P2d 548, *rev den* 299 Or 31 (1985).

Annie Mae Harris died on March 30, 1982, at the age of 69, leaving an estate valued at over $200,000. She was survived by a nephew, Richard Williams, the contestant in this action, and a niece, Bettie Lou Overton, the proponent and primary beneficiary of decedent's 1982 will. Contestant is the son of decedent's brother; proponent is the daughter of decedent's sister. Prior to 1936, decedent's entire family lived in Alabama. In that year, decedent's brother and contestant, then two years old, moved to Cleveland, Ohio. In 1943, decedent, her husband, her sister and proponent moved to Portland, where they were joined by decedent's mother two years later. The entire family apparently resided together through 1948.

In 1966, decedent's husband died. She had no children and continually referred to proponent as her daughter and to contestant as her son. Decedent was injured while working for the railroad in 1973 and received a settlement of approximately $100,000 in 1976. After the accident, proponent regularly took her to the doctor, paid her bills and assisted her in personal care and household chores. Proponent testified that decedent had recovered to some extent by 1978 and that, despite decedent's demands, she devoted more of her time to her own life. By that time, proponent's children were of an age to perform tasks for decedent, such as running errands and mowing the lawn. Decedent apparently relied on

proponent, her children and others for shopping, cooking and transportation.

On May 17, 1978, decedent executed a will that gave $15,000 to the Watch Tower Bible Society, $1,000 to Ricky Overton, her grandnephew, and the remainder of the estate to contestant. That will stated: "I do not will any real or personal property or even one penny to either Bettie Overton or her children, Debra and Terry Overton." At about the same time that the will was executed, decedent changed her bank accounts to remove proponent's name as an authorized signer. She never mentioned the will to proponent or to any of proponent's friends. She referred to the will as her "white piece of paper," because she was afraid that someone would overhear her mentioning it, and she kept a copy of it hidden under her television set.

At decedent's request, her 1978 will was drafted, and the original was kept, by Brenda Turner, decedent's friend and a member of Jehovah's Witnesses. Testimony showed that decedent was a devout member of that church. Although her attendance at church meetings dropped to about two times per week during the last year of her life, her attitude toward her church never changed.

Contestant testified that he visited decedent yearly when he was very young and that, when he was older, they spoke on the phone about once a month. Decedent visited Cleveland sometime during the 1950s and attended her brother's funeral there in 1963. In 1975, contestant came to Portland to visit his grandmother during her last illness, and in 1979 his wife visited decedent in Portland for a week. In 1980, decedent flew to Cleveland. When she returned, she complained about the treatment she had received during that visit. Other witnesses testified, however, that she continued to express affection for contestant but complained about lack of attention from proponent and her children. All of the witnesses testified that decedent was very demanding of services and attention.

Proponent testified that, as early as July, 1981, decedent had asked her to prepare a will, leaving everything to proponent. After numerous requests, on the evening of January 14, 1982, proponent typed a will which gave $15,000 to contestant and the remainder of the estate to proponent. She

arranged for various witnesses to be present for the execution of the will at decedent's home on January 15. The witnesses were proponent's husband, Henry McDowell, her son, Terry Overton, her friend, Mary Holden, and her daughter's friend, Burnell Bailey. In addition, her daughter, Debra Overton Raiford, and her son's girlfriend, Theresa Taylor, and two young children were present in the next room while the will was being executed. According to the testimony of all of the witnesses, on their arrival at decedent's home at approximately 5 p.m., proponent asked them to sit around the dining room table. She then read the will to decedent and told her that the typographical errors would have to be initialled. Decedent stated that she could not initial all the necessary places, because her hand was cramped and it hurt. She also asked proponent to sign her name for her. Proponent declined, stating that she could sign another day when her hand felt better. Decedent insisted that the will be executed and asked if she could make an "X." Proponent approved the idea, but decedent again asked proponent to sign for her. Proponent refused. Decedent then proceeded to make 15 or 16 "Xs" in the places where typographical errors were corrected. She also put an "X" on the signature line. Proponent put her initials by the "Xs" and next to the "X" on the signature line wrote "(her mark) Bettie Lou Overton."

Proponent testified that decedent complained that the bequest of $15,000 to contestant was too much and that $5,000 would have been ample, but that, after some discussion, decedent finally agreed to leave the $15,000 bequest in the will. According to proponent, decedent requested that proponent take the signed will and keep it in her home, which she did. On March 29, the night before her death, decedent spoke to her lifetime friend, Audrey Fuller. Fuller testified that decedent said from her hospital bed, "I'm afraid because they have been all through my house. I'm afraid for that white piece of paper." Decedent was expecting to be home the next day. When Fuller called decedent's home the next day, the line was busy, so she went directly there. Proponent and her husband were in the house, which Fuller described as "all tumbled up." She stated that drawers had been emptied, and things were all over the table. She said that proponent told her that they had been "looking for rats." Proponent testified that they were cleaning up the house, as well.

According to contestant, when proponent was presented with a copy of the 1978 will after decedent's death, she became angry and called decedent names and said she was going to make sure that Jehovah's Witnesses (she said "Honkies" and "White Folks," but it is pretty clear that she was referring to Jehovah's Witnesses) did not spend any of decedent's money. Proponent denied making those statements.

Numerous witnesses testified that decedent could read and write her own name, that she was proud of that fact and that she had never before signed anything with an "X." The trial court so found, and it specifically also found that there was no evidence that she had signed any other document with anything other than her full signature, "Annie Mae Harris." Exhibits were presented which showed that both immediately before and immediately after her execution of the will of January 15, 1982, decedent signed her full name on various documents. Contestant's expert witness examined the 1978 and 1982 wills and concluded that, although decedent signed the 1978 will, the spacing, peculiarities of formation, the tremor, the patterns and distortions of decedent's handwriting led her to conclude that decedent did not make any of the "Xs" on the 1982 will, which were neat, even and undistorted. Proponent's expert testified that it was not possible to determine whether decedent put the "Xs" on the 1982 will in the absence of exemplars of "Xs" known to have been made by her.[1]

Decedent had several medical problems, including obesity, diabetes and problems with her hip. Proponent's witnesses testified that, at about the time of the execution of the will, decedent complained of suffering from cramps in her hands on several occasions. Contestant's witnesses testified that, although decedent often complained about aches and

---

[1] Contestant called another handwriting expert, who had been retained by proponent but not called by her. The trial court sustained proponent's objection on attorney-client privilege grounds. *See Brink et ux v. Multnomah County,* 224 Or 507, 356 P2d 536 (1960). Contestant's offer of proof was that the witness would have testified that, in her opinion, decedent did not put the "Xs" on the will. That ruling is assigned as error. Contestant also assigns error to the trial court's permitting the person whom proponent did call as an expert to testify over contestant's objection to his qualification. Given our disposition of the case, we need not decide either of those questions.

pains in other parts of her body, she had never complained about her hands. In fact, decedent engaged in such activities as knitting, crocheting and quilting. Contestant's expert witness, Gill, a hand surgeon, testified that all of his patients have hand problems, but it is extremely rare for them to be unable to sign their names. He examined the 1982 will and stated that a person who was able to make all of the "Xs" on the will could have signed her name as well. Another hand surgeon reviewed all of decedent's medical records and found that the only reference relating to decedent's hand referred to decreased utilization of the right extremity. He stated that diabetes does not cause hands to clench up and, although it can result in neuropathy, in all cases a diabetic with neuropathy can hold a pen. He also stated that the "Xs" on the 1982 will were not consistent with a writer who was experiencing pain and clenching in her hand. Proponent's expert witness, a family practitioner and decedent's treating physician, stated that diabetics can suffer from cramping and pain in their hands as a result of intermittent neuropathy. He also stated, however, that decedent never complained about pain in her hands and that he had not diagnosed her as suffering from neuropathy.

In addition to the witnesses present at the execution of the 1982 will, several other persons testified that decedent either mentioned that she wanted proponent to draft a will for her, or that proponent had drafted a will for her. Only one of those witnesses appears to have been told that decedent had an earlier will. Raines, a notary public and decedent's neighbor, testified that, in the summer and fall of 1981, decedent had asked him to prepare a will for her. In January, 1982 (before the will had been prepared), however, decedent told him that she would no longer be needing his services, because proponent was taking care of it. Other testimony was highly contradictory. Decedent apparently never mentioned the 1982 will to several of her close friends and, during the last few months of her life, continually said that she would leave everything to her nephew, contestant. She felt that she had never done anything for him, whereas proponent and her family had received their share over the years. She also expressed fear that proponent would learn of the 1978 will.

The trial court, in a carefully considered opinion, approached the resolution of this contest in the traditional

manner. First, it addressed the question whether the will had been duly executed, placing the burden on proponent. After concluding that proponent had sustained her burden, the court addressed contestant's contentions relating to undue influence, concluding that he had not sustained his burden of proof.

As we view this case, there is no other like it. There are cases that involve signing with an "X," which, generally, present no particular problem if the testator was not able to sign his name, *Pool v. Buffum,* 3 Or 438 (1869), so long as he intended to be bound thereby. *In re Young,* 60 Ohio App 2d 390, 397 NE2d 1223 (1978); *Thompson on Wills* § 109 (1962). There are two New York cases involving a testator who was able to sign his name, but used an "X" in signing his will. *In re Stegman's Will,* 133 Misc 745, 234 NYS 239, *aff'd* 227 App Div 647, 235 NYS 890 (1929); *In re Irvings' Will,* 153 App Div 728, 138 NYS 784 (1912), *aff'd* 207 NY Rptr 765 (1913). The latter case states, and the former case holds, that when one deriving a substantial benefit under a will is instrumental in obtaining it, and when other interested persons act as witnesses, clear and satisfactory evidence is required to sustain the proponent's burden of proving that the testator, who ordinarily was able to sign his name, made the "X" on the will.

Here, the trial court applied that rule and, after reviewing the evidence at length, concluded that the testarix did make the "Xs" on the will—that is, it was not a forgery. Without further discussion, the court also concluded that the testrix did so with the intention of authenticating that document as her last will. As we have said, however, this case is unique. In addition to the factors involved in the New York cases, here the proponent not only is the principal beneficiary under the will, but she actually prepared it. That will is substantially different from the 1978 will. In addition, historically, proponent's relationship to decedent had been a confidential, if not a fiduciary, one. She had been an authorized signator on decedent's bank account, at least until some time in 1978, and had paid her bills from that account. Decedent confided in proponent for advice on investments and other financial matters up to the time of her death. More importantly, proponent was entrusted with the preparation of a new will for decedent.

The trial court considered that evidence in connection with the claim of undue influence and concluded that there was no evidence of a confidential relationship, because there was no evidence that proponent was in a position of dominance over decedent. It is true that, in cases involving undue influence, there must be more than a confidential relationship between the proponent and the testator before the burden of proving the absence of undue influence is put on the proponent, if it ever is.[2] In this context:

> "A confidential relationship * * * means a fiduciary relationship, either legal or technical, wherein there is a confidence reposed on one side *with a resulting superiority and influence on the other.* It may be a moral, social, domestic or merely a personal relationship. * * *" *In Re Estate of Manillus Day,* 198 Or 518, 530, 257 P2d 609 (1953). (Emphasis supplied; citations omitted.)

According to proponent, she took care of decedent during the last year of her life. Decedent was obese and diabetic and suffered from a hip injury incurred in the railroad accident. She was somewhat feeble, walked with a cane and was deteriorating steadily. Proponent helped her bathe, cut her nails, washed her hair and ran errands for her, including banking. She also said that she took care of "her business," by which she apparently meant advising her on how to invest her money.

Clearly, there was a personal relationship between decedent and proponent by virtue of which the former had trust and confidence in the latter, and it seems clear that proponent had some influence over decedent on important matters. We do not say that there existed a position of dominance over decedent such as to warrant the conclusion that decedent's will was overborne at the time she put her "Xs" on the will. That is not the question that concerns us. However, the confidential relationship resulting in some influence is relevant to a resolution of this case.

■■ The question here is whether decedent put the "Xs"

---

[2] It is not entirely clear whether the existence of a confidential relationship that results in dominance over the testator actually shifts the burden of proof or of coming forward. *See In Re Southman's Estate,* 178 Or 462, 168 P2d 572 (1946). It seems clear, however, that it reduces the quantum of proof required of the contestant to show undue influence. *In Re Estate of Elise Rosenberg,* 196 Or 219, 246 P2d 858 (1952).

on the will because she was unable to sign her name, or whether she was able to sign her name but did not do so because she did not want to and did not intend that the document be her last will,[3] revoking her earlier one. The burden is on proponent to prove due execution of the will. Normally, the presence of an attestation clause reciting the will's due execution creates a presumption of due execution, and that presumption may be overcome only by clear and convincing evidence. *In Re Davis' Will,* 172 Or 354, 142 P2d 143 (1943). Although the will in question has an attestation clause, this is not a normal case.

We agree with the trial court that proponent was required to establish by clear and convincing evidence that decedent put the "Xs" on the will, and that she met that burden here. We also agree that, for purposes of making a *prima facie* case of due execution, it is enough for proponent to provide a "satisfactory" explanation of why decedent used a mark instead of her full signature. Although she did that here, the record as a whole satisfies us that decedent was, in fact, able to sign her name but did not do so, because she did not want to sign it. The medical evidence persuades us that there was no medical reason why decedent could not have signed her name. That evidence indicates that a person, even with hand problems, who could make 15 or 16 "Xs" could sign her name and that the "Xs" made by decedent were not consistent with what would be expected of a writer who experienced pain and clenching in her hand. An examination of the will tends to bear that out. Decedent signed no other document with an "X", either before or after she put the "Xs" on her will; she always signed her full name, and did so immediately before and immediately after the occasion in question. Proponent, not decedent, asked the witnesses to sign as attesting witnesses. The record supports the conclusion that decedent could, but did not want to, sign her name, as she had always done before and as she did later.

We need not decide why she did what she did. However, the record shows that decedent was a devout member of Jehovah's Witnesses and that her attitude toward the

---

[3] *See* ORS 42.005 and 71.2010(39), each of which, in other contexts, defines "signature" to include any symbol executed by a party with present intention to authenticate a writing.

church had never changed. The fact that the earlier bequest to the church-sponsored organization was eliminated from the proposed will without comment or discussion seems unusual. There was some disagreement about the bequest to contestant. Proponent testified that decedent had told her that she had given her house to proponent's older son but had not executed a deed; the will does not take care of that matter. Decedent, who was surrounded by proponent, proponent's relatives and friends in her home, late in the day, may have simply wanted to terminate the meeting without discussing the contents of the proposed will in their presence and may have thought she was signalling her lack of intent to authenticate the will by using "Xs" instead of her name.

The evidence relating to events following the will ceremony at decedent's home is ambiguous, at best. Decedent told some people that she had made a new will, although on several of the occasions when she did so proponent was present. She told others that she was leaving her property to contestant and explained why she was doing so. She not only did not destroy her 1978 will, she told others that she had a "white piece of paper" that she kept under her television set. When she was in the hospital the night before she died, she told a lifetime friend that she was concerned that "they" had been all through her house and that she was "afraid for that white piece of paper." Proponent learned of the earlier will on the day decedent died; she and her husband were found by the same friend going through decedent's drawers in her home. A reasonable inference is that she was looking for the earlier will before offering the 1982 will for probate and may have been concerned about the validity of the later will. At trial, she contested the validity of the 1978 will; if she had prevailed on that challenge and if the 1982 will were held to be invalid, decedent's property would have gone by intestacy.

The burden was on proponent to establish by clear and convincing evidence that decedent intended to authenticate her will when she put the "Xs" on it. Given the ambivalent record, we cannot say that she sustained her burden. It would just as well support the conclusion that decedent did not believe that she had made a new will in 1982 and that her earlier will had not been revoked. Accordingly, we conclude that the purported will of January 15, 1982, is not entitled to probate in solemn form.

In the trial court, proponent challenged the validity of decedent's 1978 will, contending that it had not been duly executed. The trial court made findings and concluded that it had been duly executed. Proponent has not appealed from that determination. Given its conclusion that the 1982 will was valid, however, the court ruled that the 1978 will had been revoked by the later will. Having concluded that the 1982 will is not valid, the 1978 will is reinstated. *See Flanders v. White,* 142 Or 375, 18 P2d 823 (1933).

Reversed and remanded with instructions to admit decedent's will of May 17, 1978, to probate in solemn form.