Argued and submitted October 4, affirmed December 13, 2000

Lela M. ANDERSON,
Margaret E. Barr, Darrell R. Hone,
Vernon R. Hone, Leanna P. Nasby,
Karen M. Barr, Margaret A. Voth and Diana L. Lark,
*Appellants,*

*v.*

Ledadeane HAGEDORN,
South Coast Hospice,
an Oregon non-profit corporation,
and Charlie Tye, Personal Representative of
the Estate of Carl M. Hone,
*Respondents.*

(98-CV0370; CA A106948)

15 P3d 582

Thomas C. Howser argued the cause and filed the briefs for appellants.

Jon Littlefield argued the cause for respondents. With him on the brief were Jerry O. Lesan, Lesan & Finneran, and Mike O'Dwyer.

Before De Muniz, Presiding Judge, and Haselton and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

Plaintiffs are siblings, nieces, and nephews of testator, Carl Hone. They are contesting two of the three wills that Hone executed during the last year of his life. ORS 113.075(1)(a). Plaintiffs contend that a caregiver, Ledadeane Hagedorn, exerted undue influence on Hone and caused him to disinherit plaintiffs in favor of Hagedorn and a charity, South Coast Hospice (Hospice). Defendants are Hagedorn, Hospice, and the personal representative named in the February 1998 will. The trial court determined that the final will, executed in February 1998, was valid and was not the product of undue influence. Plaintiffs appeal. On *de novo* review, ORS 19.425(3), we affirm.

The record before us is unusual because it contains tape recordings of the testator's thoughts and intentions given at a legal proceeding nine months before he died and eight months before his final will was executed. We have reviewed the extensive record in its entirety and conclude that an exhaustive recitation of the facts here would be of little benefit to the bench or the bar. We therefore present only those facts necessary to properly understand and analyze the issue before us.

Hone was an 82-year-old lifelong bachelor when he suffered a disabling stroke in late October 1996. He was hospitalized for several days and then spent several months convalescing in a nursing home. During that time, Hone's niece, Judith Doyle, began taking care of his personal finances. Hone's family hired Hagedorn in January 1997 to care for Hone at his residence upon his return. In early February, three days after Hone returned home, he was readmitted to the hospital suffering from internal bleeding. Hone's attending physician described his condition as grim. While in the hospital, Hone executed a will and trust (February 1997 will) with Doyle as trustee. Hone's estate consisted of over 500 acres of property that included a residence, outbuildings, farmland, and land suitable for logging. Hone recovered and returned to his residence by the end of February.

Almost immediately upon Hone's return, his relations with plaintiffs began to deteriorate. Hone complained of

his inability to get access to his bank accounts or take care of his finances and expressed his displeasure with Doyle's handling of his finances. Plaintiffs complained of "restricted access" to Hone. They noted that they were told that they had to call before visiting Hone, were asked to limit their visits so that Hone could recuperate, and were prevented from visiting Hone because the front gate was locked. They attributed those changes from previous practices to Hagedorn. In late March 1997, the family had a meeting where, among other things, Hone and plaintiffs disagreed about Hagedorn's position as caregiver and about Hone's finances. As a result of that meeting, Doyle and another niece resigned their positions as trustee and successor trustee of Hone's estate.

Following the March meeting, Hone became increasingly distressed by his siblings' assertions that he belonged in a nursing home and by his inability to regain control of his assets. In early May 1997, Hone met with an attorney, Ms. Melvin-Davidson, to change his estate plan. After several meetings with Melvin-Davidson, and at her recommendation, Hone met with a second attorney, Mr. Gould, for that same purpose.

In early June 1997, Hone's siblings initiated a protective proceeding in circuit court seeking to appoint a guardian and conservator for Hone. The siblings were appointed temporary guardians and conservators. The protective proceeding consisted of two hearings, approximately one-month apart, with a visitor's report prepared in the interim. That report was not favorable to the siblings. The court concluded that Hone did not need a guardian. It did, however, conclude that Hone was in need of assistance with his financial affairs and held a conservatorship hearing in late July 1997. Despite the siblings' efforts to have themselves or a party of their choosing appointed as conservator, the court appointed Mr. Fandel, an accountant considered by Hone to be a neutral third party. Also during June, while the protective proceeding was pending, the temporary guardians attempted to have Hagedorn forcibly evicted, sought to have criminal proceedings initiated against Hagedorn, and made arrangements to place Hone in a nursing home.

In August 1997, Hone executed a will (August 1997 will) that revoked the February 1997 will and trust. The August 1997 will gave nominal sums to Hone's siblings, nieces, and nephews and the residue to South Coast Hospice. That will was executed in Fandel's office. In February 1998, Hone and Melvin-Davidson met with a third attorney, Mr. Burch, and eventually Hone executed a new will (February 1998 will) that gave Hagedorn a life estate in the residence, outbuildings and farmlands, and established a trust in the remaining lands for the benefit of Hagedorn with Hospice as trustee. The February 1998 will also provided that, upon Hagedorn's death, the entire estate was to pass to Hospice.

Hone died in March 1998, and plaintiffs challenged the February 1998 and August 1997 wills. After a four-day trial to the court, the court entered a judgment in favor of defendants and declared that the February 1998 will was valid and entitled to probate. Plaintiffs appeal and make three assignments of error. Because plaintiffs' second and third assignments of error do not merit discussion, we address only the first, the undue influence claim.

**1.** We follow the framework established by *In re Reddaway's Estate*, 214 Or 410, 329 P2d 886 (1958), to analyze plaintiffs' undue influence claim. That framework requires us first to determine whether a "confidential relationship" existed between the testator and the challenged beneficiary and, if one did exist, to evaluate whether "suspicious circumstances" were present as defined by seven enumerated factors. The presence of a confidential relationship under suspicious circumstances raises an inference of undue influence, and the beneficiary must then produce evidence to overcome that inference. *See Ramsey v. Taylor*, 166 Or App 241, 262, 999 P2d 1178, *rev den* 331 Or 244 (2000) (describing process). Because it resolves the issue before us, we analyze only the February 1998 will.

We agree with the trial court's conclusion that a confidential relationship existed between Hone and Hagedorn. That conclusion warrants no further discussion, so we proceed to the remainder of the *Reddaway* analysis.

The first *Reddaway* factor is whether the beneficiary participated in the preparation of the challenged will.

*Reddaway*, 214 Or at 421-22. The record contains evidence and testimony that Hagedorn was incidentally involved with the preparation of the February 1998 will. Hagedorn hand wrote letters, which were then signed by Hone, that listed how Hone wished to devise his estate. Hagedorn also transported Hone to meetings with attorneys preparing the will and, on at least some occasions, was present during those meetings. That involvement constitutes a suspicious circumstance sufficient to raise an inference of undue influence. However, that inference is overcome by extensive evidence in the record. As the trial court noted, Hagedorn's presence at meetings is attributable to the fact that Hone was unable to drive due to his physical limitations and that she was, in effect, his chauffeur. Likewise, Hone's stroke left him partially paralyzed on his right side and he was unable to write. Consequently, all his letters and notes for discussions were written by Hagedorn. Hone confirmed that he had dictated those documents by signing them at the bottom of the page. The record also shows that Hagedorn's presence during meetings between Hone and his attorneys was sporadic. And, while Hagedorn was present during Hone's initial conference with Burch to discuss the February 1998 will, all testimony indicates that she remained silent throughout that meeting. Last, there is evidence that Hagedorn did not participate in the selection of any of the three attorneys that Hone consulted concerning his estate plan. Hagedorn's involvement did not support a conclusion of undue influence.

■ The second factor is whether Hone had the "benefit of the independent advice of his own attorney in drawing up" the February 1998 will. *Id.* at 422. The preparation and execution of that will included the assistance of Melvin-Davidson, Fandel, and Burch. The record shows that those advisors caught an error in the draft of the February 1998 will. The draft, prepared by Burch, gave Hagedorn a life estate in the lands suitable for logging. Melvin-Davidson and Fandel understood that Hone actually wanted those lands placed in trust for the benefit of Hagedorn and, with Hone's approval, informed Burch of the discrepancy. Consequently, Hagedorn received less under the executed February 1998 will than she would have under the draft version. We conclude that Hone received independent advice in drawing up and executing the

February 1998 will and that no suspicious circumstances existed.

■ The third *Reddaway* factor concerns whether there was secrecy and haste in the making of the will. *Id.* at 423. Hone first began preparations for revising his estate plan in May 1997. Completion of that will was delayed by the protective proceeding. At that proceeding, Hone testified of his intention to change his estate plan. That intention was realized when the August 1997 will was executed. Hone expressed his intent to change that will in October 1997, five months before the execution of the February 1998 will. Furthermore, at least three other people—Melvin-Davidson, Fandel, and the designated personal representative—were aware of the fact that Burch was preparing a new will for Hone. There was no secrecy or haste in the making of the February 1998 will.

■ The fourth factor concerns whether there was an unexplained change in the testator's "attitude toward those for whom he had previously expressed affection[.]" *Id.* While there is evidence that Hone's attitude towards plaintiffs changed in early 1997, that change is not unexplained. As the trial court noted, "[t]he change in attitude towards his family was clearly caused by their own actions and the explanation for the change is clearly supported by the conduct of [p]laintiffs." Hone was upset by the mishandling of his funds by Doyle and by the February 1997 will and trust she had procured. Hone was further disturbed by the treatment he and Hagedorn received from his family and by plans to return him to a nursing home. The animosity created by those actions was compounded by the protective proceeding initiated by Hone's siblings. Ultimately, Hone felt that the family's interest was only in his property and not his health. The change in Hone's attitude towards his family is well explained and does not create a suspicious circumstance.

■ The fifth factor is whether there was a discrepancy between the testator's new and previous will and whether there was a continuity of purpose running through his former wills indicating a settled intent in the disposition of his estate. *Id.* at 424. Hone did not have an estate plan before the February 1997 will. Evidence indicates that he assumed and

intended that, when he died, the farm would go to his family. The testamentary provisions of the February 1997 will were largely consistent with that intent. A comparison between that will and the August 1997 will indicates a change in Hone's testamentary intent. However, that change is readily explained by the strained relationship between Hone and his family described above and does not constitute a discrepancy. In preparing for the August 1997 will, Hone initially planned to give almost everything to the Red Cross and only nominal amounts to his family. The record reveals that the idea of changing the beneficiary to Hospice arose from a conversation between Hone and his home health nurse that occurred outside Hagedorn's presence. Thus, the designation of Hospice as primary beneficiary of his estate in the August 1997 will is not suspect.

The primary changes between the August 1997 will and the February 1998 will include the addition of a life estate and trust for Hagedorn and the removal of his family members from his will. The inclusion of Hagedorn in the February 1998 will does not raise an inference of undue influence. The record reveals that Hone initially planned to give Hagedorn some funds in the August 1997 will, but he then removed her name from that will because he feared that his family would create problems for her. Hone thought he was doing Hagedorn a favor by not including her in his will. After the family had left him alone for several months following the protective proceeding, Hone concluded that providing for her in his will would not cause her the problems that he had previously feared. Accordingly, he provided for Hagedorn in the February 1998 will. The removal of his family from the February 1998 will likewise does not create a suspicious circumstance. The record indicates Hone's settled intent of disinheriting his relatives. Burch advised Hone that he need not include nominal amounts to his family if he did not want to. Based upon that information, Hone requested that the February 1998 will not devise anything to his family. The changes in Hone's February 1998 will did not occur under suspicious circumstances nor support a conclusion of undue influence.

The sixth *Reddaway* factor is whether the provision for the beneficiary amounts to an unnatural or unjust gift. *Id.*

at 424-25. We agree with the trial court that, given the way the family members behaved, they did not have any reasonable expectation of being the recipient of Hone's bounty. Thus, the fact that Hone favored his caregiver and a charity over family members as beneficiaries did not make the gift unjust or unnatural. Furthermore, a life estate in the residence and farm, with a trust in the lands suitable for logging that is administered by Hospice, is not unjust.[1] The ultimate beneficiary of the estate is a charity, Hospice. It is the type of organization that one would expect to be the beneficiary of an estate of someone who wishes to disinherit those who might otherwise be considered to have naturally or justly received his estate.

■ The last factor is whether the physical and mental condition of the donor made him susceptible to influence. *Id.* at 426. Although Hone had a permanent physical impairment due to his stroke and needed the assistance of a caregiver, he was not totally dependent upon his caregiver. Hone was not dominated by Hagedorn. Hone's physician stated that Hone did not fear what Hagedorn might say or do. The evidence establishes that Hone was in full control of his mental faculties during the preparation and execution of the February 1998 will. By all accounts, Hone could be a tenacious and stubborn person who said and did whatever he chose. There is no evidence that his physical or mental condition made him susceptible to undue influence.

We conclude that, although Hone and Hagedorn had a confidential relationship, any suspicious circumstances that might give rise to an inference of undue influence have been overcome by testimony and evidence in the record. Accordingly, we conclude that the February 1998 will was the product of Hone's own free will and affirm.

Will contests often present emotionally difficult issues for family members. Here, several plaintiffs testified that they believed that there was no real conflict between them and Hone, only a conflict between them and Hagedorn.

---

[1] The record reveals that Hone did not want Hagedorn to be personally responsible for the property taxes levied on the property. Hone expressed his intent to Melvin-Davidson that the proceeds from timber sales were to be used to pay property taxes and other expenses.

Because we believe that the trial court's letter opinion concisely and accurately summarized the events and family attitudes that followed Hone's stroke, we reproduce it here:

"The court wishes to stress that some of the plaintiffs created problems with the decedent for themselves and other plaintiffs as early as March, 1997 and the problems had nothing to do with defendant Hagedorn or any other defendant. The problems were exacerbated by the attempt to have the decedent declared incompetent when it was clear he was not incompetent. In this regard the court finds that Ms. Doyle was as involved as the decedent's three siblings in the effort to have the decedent declared incompetent. After the guardianship hearing the decedent was basically abandoned, not because of a locked gate, but because some plaintiffs were mad and upset with the decedent. Pride seemed to govern the actions of some plaintiffs. They tended to ignore that after returning home the decedent had to deal with recovering from the stroke and subsequent hospitalization. They appeared to feel that since he was home, all things should remain as they had been. The recovery from the stroke and subsequent hospitalization was, in effect, an inconvenience to them and when it was pointed out to them that the decedent needed rest and should not be upset, they resented receiving that information."

Affirmed.