Argued and submitted October 9, 2007, Madras High School, Madras, affirmed March 19, petition for review denied May 29, 2008 (344 Or 558)

In the Matter of the Estate of
Ruth M. Comins, Deceased.

Jack W. HARRIS,
*Appellant,*

*v.*

Summer JOURDAN,
*Respondent.*

Jack HARRIS,
Personal Representative of the Estate of
Ruth M. Comins
and Jack Harris, individually,
*Plaintiffs-Appellants,*

*v.*

Ruth M. COMINS,
*Defendant,*

*and*

Summer JOURDAN,
*Defendant-Respondent.*

Washington County Circuit Court
C05-0192PE, C05-1049CV

A131582 (Control); A131891

180 P3d 119

George W. Kelly argued the cause and filed the briefs for appellant.

James R. Cartwright argued the cause for respondent. With him on the brief was Matthew Whitman.

Before Edmonds, Presiding Judge, and Ortega, Judge, and Neilson, Judge pro tempore.

EDMONDS, P. J.

**EDMONDS, P. J.**

This probate proceeding involves competing claims to the estate of Ruth Comins. Between April 2003 and her death in August 2004, Comins executed a number of wills. The appellant in this case, Jack Harris, was the beneficiary of one of those wills and offered that will for probate. Summer Jourdan, the respondent on appeal, was the beneficiary of an earlier will, and she contested probate of the will in favor of Harris on the ground that it was procured through undue influence. Harris, in turn, alleged that, if anyone exerted undue influence over Comins, it was Jourdan. He asked the probate court to first decide the question of Jourdan's undue influence because, if the will in her favor were determined to be invalid, she would not be an "interested person" entitled to contest the later will in his favor. The probate court declined to decide the "will contest within a will contest" and determined that Jourdan had sufficiently demonstrated that she was an "interested person" entitled to contest the probate of the will. The court further concluded that the will in favor of Harris was the product of undue influence and entered judgment to that effect. Harris appeals, and we affirm.

## I. BACKGROUND

On *de novo* review, *Williams v. Overton,* 76 Or App 424, 426, 709 P2d 1115 (1985), *rev den,* 300 Or 563 (1986), we find the following facts.[1] Comins and Jourdan first met in approximately 1975, when both were working in the Multnomah County Courthouse. At the time, Comins, a

---

[1] ORS 111.105(1), which concerns appeals from a probate court, provides:

"Except as otherwise provided in this section, no issue determined in a probate court shall be tried again on appeal or otherwise reexamined in a manner other than those appropriate to issues determined by a court of record with general jurisdiction."

ORS 111.105 was enacted in 1969 and was subsequently amended in 1979 (like many other statutes) to eliminate references to law and equity. We have, both before and after the 1979 amendments, rejected the argument that the legislature intended to abolish *de novo* review of will contests, *Williams,* 76 Or App at 426; *State v. Nesbitt,* 23 Or App 202, 212, 541 P2d 1055 (1975), and have consistently exercised *de novo* review in such cases pursuant to ORS 19.415(3), *see, e.g., Walker v. Roberds,* 182 Or App 121, 123, 47 P3d 911 (2002); *Anderson v. Hagedorn,* 171 Or App 425, 427, 15 P3d 582 (2000); *King v. Fuston,* 147 Or App 238, 239, 936 P2d 365, *rev den,* 325 Or 438 (1997).

grand juror bailiff, was in her mid-50s, and Jourdan, a courtroom bailiff, was in her early 20s. The two became close friends and visited during work hours. Comins's employment was later terminated for budgetary reasons, and Jourdan helped her find a job as a legal secretary in a law office. Eventually, Jourdan left her position as a courtroom bailiff and Comins filled her vacancy, thereby allowing Comins to qualify for retirement benefits.

Even after Comins and Jourdan were no longer working together, they remained in contact almost daily. After Comins's husband, Ted, retired, Jourdan began visiting the Cominses at their residence, and the Cominses would come to Jourdan's home for dinner almost every Sunday night. Because the Cominses had no children and no other close family members, they treated Jourdan much like a daughter.

The Cominses lived on a five-acre parcel of rural property in Washington County. At some point while Jourdan was working on the property with Ted, he told her that the Cominses intended to leave the property to her. According to Jourdan,

> "He watched me ride the tractor through his field and he would say to me, 'It's—we didn't know what we were going to do with it once something happened to us, but you're like the daughter we never had. You care about the property.' He said, 'I never saw a girl hammer a nail before, but you can just swing a hammer * * *.'"

Ted never formalized an estate plan, but, according to Jourdan, "It was just always understood that [the property] was going to go to [her]."[2]

Shortly before his death in 1991 and over his wife's objection, Ted arranged to sell the property. Ted died, however, before the sale was final, and Comins sought to rescind the sale.[3] She then called Jourdan and asked for her assistance in unwinding the sale. Ultimately, Comins was able to rescind the sale.

---

[2] We note, parenthetically, that the trial court did not make any express credibility findings. Frankly, portions of the testimony of both Harris and Jourdan strain credulity and, at points, are internally inconsistent. We have done our best to resolve those conflicts on the record before us.

[3] Though not material to our review, the details of this transaction are not entirely clear from the record.

In the year after Ted's death, Comins and Jourdan continued to visit often; whenever Jourdan had a day off, she would spend it with Comins. Then, in 1992, Jourdan decided to move to California to live near her mother and sisters. Comins was disappointed by Jourdan's decision and told her that "her plan had always been that [Jourdan] would buy a mobile home and park it on her property and that [they] would grow old together there."

A week or so before Jourdan left for California, Comins contacted Jourdan and told her that she had prepared a deed that gave title to Jourdan. Comins wanted to take care of the matter before Jourdan left, and she asked her to come out to the property to sign it. The deed was then signed, notarized, and recorded. A few months later, however, Comins contacted Jourdan in California and told her that she had spoken with one of her friends and concluded that the deed could create liability issues for Comins in the event that Jourdan was in an accident and was sued in California. She asked Jourdan to execute a correction deed that removed Jourdan's name from the deed. Jourdan complied and returned the correction deed to Comins. Comins, in the meantime, told Jourdan that she was looking into a trust or a living will arrangement so as to avoid any perceived liability issues. However, Jourdan and Comins never discussed the matter of a trust or living will after that conversation.

After Jourdan moved to California, she continued to talk on the phone with Comins almost every day, and sometimes twice a day. During that time, Comins was lonely and, according to her neighbors Robert and Peggy Lowry, was emotionally "needy." Robert Lowry testified that Comins was "kind of insecure. Relatively needy, meaning she needed attention and needed friends and people around her." Peggy Lowry similarly observed that Comins was a "very needy person as far as emotionally. * * * [S]he wanted to be needed and she wanted to be wanted."

During that same time, Comins struggled to manage her finances. Despite the fact that she was living on a very limited income, Comins sent money to various causes, including numerous psychics and television evangelists. According to Robert Lowry, who was the Chief Financial Officer for Washington County, he attempted to help Comins with her

finances, but Comins was convinced that she was going to come into a large sum of money. In fact, Comins became convinced that she had won "the Publisher's Clearinghouse kind of deal" and that a truck with prize winnings and camera crews would arrive at her house. On a specific Saturday, she purchased patio furniture and invited friends over for a picnic to wait for the truck; it never arrived.

In managing her finances, Comins was assisted by Peggy Retzlaff, a financial representative at Washington Mutual Bank. Comins initially met Retzlaff when Retzlaff was a teller at the bank where Comins deposited her monthly pension checks. Retzlaff became concerned about Comins's overdrafts and the possibility that she was being "scammed." Retzlaff ultimately became more involved with Comins's finances, helping her to manage her check register and to establish a budget.

The combination of Comins's financial situation, her trusting nature, and her desire for companionship was a continual source of concern for Jourdan, the Lowrys, and Retzlaff. At one point, those fears were realized when Comins fell victim to a financial predator in Canada whom she knew only as "Anthony." Anthony, who was in his thirties, first contacted Comins by phone to inform her that she had won a foreign lottery. He subsequently convinced Comins that he planned to marry her, despite the fact that she did not know his last name or his phone number. Over the course of the relationship, Comins sent him substantial sums of money and, when Jourdan and others attempted to intervene, Comins became angry and refused to believe that she was the victim of a scam.

In 1997, a person named Ray Copelin showed up at Comins's house and asked her if she would like to rent him a room. He explained that he had just been recently divorced and was hoping that he could live at the house for a reasonable price and also work on the property. In his only previous contact with Comins, Copelin had once stopped at the property to ask whether it was for sale. Jourdan and Peggy Lowry cautioned Comins that she did not know anything about Copelin and urged her not to allow him to move onto the

property. Comins followed their advice and told Copelin that she could not rent him a room at that time.

In 2000, Copelin reappeared in Comins's life. He and his new wife, Laura, were riding their motorcycle near Comins's property and decided to stop and say "hello." According to Ray Copelin, Laura "took a liking to [Comins] and she invited [Comins] to go to church with [them]." Comins agreed, and the Copelins began to see Comins every Sunday. Eventually, they began taking her to church on Thursdays as well as Sundays. Soon, they were taking Comins to the beach and to the grocery store.

By 2002, the relationship had progressed to the point at which Comins said to the Copelins, "I would like for you to move in with me and, you know, when I'm gone, then you can have this place." The Copelins saw the situation as a "win-win," and they decided to sell their house and began doing more work on Comins's house to prepare for the move. However, after the Copelins sold their house, Comins began having second thoughts—after Jourdan had again asked Comins, "What do we really know about them?"[4] Comins informed the Copelins that she was having second thoughts, and the Copelins decided to buy their own house. However, they continued their relationship with Comins, taking her to church, restaurants, and the grocery store.

Sometime in 2003, as the Copelins were getting ready to leave for a cross-country motorcycle trip, Comins and the Copelins again discussed the subject of Comins's property. The Copelins asked Comins what she would like to happen to the property after she died. They told her that, if she did nothing, the property would likely go to the State of Oregon when she died. Comins said that she wanted to execute a will, but that she did not have the money to pay for its drafting. Ray Copelin then offered to pay for the will.

---

[4] Jourdan had contacted an attorney whom Jourdan and Comins both knew from their days at the Multnomah County Courthouse. Jourdan told Comins that the attorney recommended that she get something in writing from the Copelins before allowing them to move into the house.

Ray Copelin looked in the phonebook and found attorney Ruth Simonis listed. Copelin explained the situation to Simonis, and took Comins to Simonis's office. On April 3, 2003, Comins signed an advance directive, gave the Copelins power of attorney, and executed a will. The Copelins paid for Simonis's services. The April 2003 will left Comins's entire estate to the Copelins and made no mention of Jourdan. Despite her previous discussions with Jourdan about leaving the property to her, and despite the fact that she was in regular contact with Jourdan, Comins never told Jourdan that she had executed the will leaving the property to the Copelins. Shortly after the April 2003 will was drafted, the Copelins left on their cross-country trip.

Enter Jack Harris onto the scene. Harris first met Comins between 2002 and 2003, when he had helped Comins with the plumbing in her house on three or four occasions. In the summer of 2003, Harris was living in a trailer on another person's land. The landowner told Harris that he needed to move his trailer immediately.[5] Unable to find anywhere else to go, Harris decided to see whether Comins was in need of a handyman.

On June 30, Harris approached Comins about the possibility of parking his trailer on her property. Comins was amenable to the idea and told him to put his trailer on the property about 60 or 70 feet from her house. They agreed that he would either pay $100 per month or do $100 in labor each month to keep the trailer on the property. On the same day that Harris approached Comins about the arrangement, he moved the trailer onto the property. He then left for the weekend of July 4 and did not return until July 5 or 6.

On July 17, 2003—less than two weeks after moving into the trailer—Harris contacted an attorney, Robert Swift, about the possibility of Comins executing a will that would leave the property to him.[6] According to Harris, he was on a tractor working on the property when Comins said, "Well, I've—I've just watched you work here and I would like to give

---

[5] In his deposition testimony, Harris testified that he was given "like a day to get it off there." At trial, he testified that he was given 15 days to leave.

[6] At trial, Harris testified that the possibility of him inheriting the property came up two or three weeks after he moved onto the property.

you my property." Harris testified that he encouraged Comins to pray about the issue and asked her whether she had already willed the property to someone. Comins told him that she had willed the property to Ray Copelin. According to Harris, he then set up dinner with the Copelins to simply talk about "what was going on."

The notations in Swift's files, however, present a different version of what occurred. In his dictated notes for July 17, 2003, Swift states:

> "A fellow named Jack Harris came in, he has been doing work on the residence belonging to a lady named Ruth [Comins] * * * I told him to have [Comins] call me because apparently there is a gentleman named Copel[in] who is in her church who is the personal representative of her will at this time, and he refuses to give back her original will. I told Mr. Harris to have her get her original will and call me for an appointment, and then we will see about no problems with either lack of competency on her part, or undue influence on Mr. Harris' part."

Thus, it appears from Swift's notes that Harris reported a conflict with the Copelins less than two weeks after he moved onto the property and while the Copelins were still on their trip; they did not return until August 17.[7]

On July 22, 2003, Harris took Comins to a meeting with Swift. During that meeting (which included only Swift and Comins), Swift attempted to discern Comins's intended beneficiaries. Swift's notes from that meeting reveal that Comins had indicated that she was distrustful of the Copelins: "[T]he [Copelins] are now in Mississippi visiting relatives and they called [Comins] about every other week, normally, and expressed their love for her, and *she thinks that perhaps their love is for the property*." (Emphasis added.)

In the meantime, Harris continued to do work around the property, and his care for Comins grew increasingly personal. Harris was cooking and cleaning for Comins. Comins was having medical problems with her legs, and

---

[7] Harris explained at trial that Swift may have asked for the will from the Copelins and then reported to Harris that the will had not been returned. That explanation simply is not credible on this record.

Harris assisted her by washing her feet and applying lotion to her legs once or twice a day. He eventually moved into the house with Comins.

Harris also soon became very involved with Comins's finances. According to Harris, Comins told him that "she really didn't like [Retzlaff]. She enjoyed her coming up and being personable, but she didn't really enjoy someone taking her checkbook away and she wanted to have her own checkbook back * * *." He further testified that "it came to a point when [Comins] wanted to write her own bills, she didn't want [Retzlaff] doing it, and I said I would help her do that." Harris met with Retzlaff concerning Comins's financial situation and began to transfer oversight of Comins's finances to himself. He also cashed checks for Comins, some in amounts as large as $900, and began making purchases for groceries and repairs on the property and incurring other expenses on behalf of Comins.

In August, the Copelins returned from their cross-country trip and visited Comins and Harris. The Copelins were impressed by the amount of work that Harris had done for Comins, and they left the meeting with a favorable impression of Harris. Laura Copelin testified, "We met him and talked with him and we were out there for, I would say, two or three hours. And we both got in the car and * * * we both said we liked him. We really liked him. And [Comins] just seemed really, really happy." Contrary to Harris's testimony, however, the Copelins testified that the subject of a will in favor of Harris never came up during the meeting. In fact, according to the Copelins, the first they heard of Comins's intent to will the property to Harris was when they received a telephone call from Swift on August 21, 2003, asking them to return the April 2003 will.

Jourdan, unlike the Copelins, was not comfortable with the arrival of Harris into Comins's life. Toward the end of August 2003, Jourdan visited Comins to check on her welfare. When she encountered Harris on the property, she found him to be "nauseatingly sweet" and "too familiar." She demanded that he provide her with his date of birth, social security number, and driver's license number, so that she could conduct a background check on him. She then took

Comins out to lunch and, later that day, started the process of a background check on Harris.

On August 30, 2003—the day that Jourdan was scheduled to return to California—Comins apparently told Jourdan that "we need to go do a power of attorney and we need to do a will." According to Jourdan, the request came "out of the blue," and she told Comins that they could wait until she returned to California. Jourdan testified, however, that Comins was insistent that the will be executed before Jourdan left; so, Jourdan went to a stationery store and bought the necessary forms, picked up Comins, and then drove around looking for a notary. Comins did not mention to Jourdan that she had already engaged two other attorneys, Simonis and Swift, to draft wills.

Ultimately, Comins and Jourdan found a notary, and they executed a will and power of attorney in front of the notary. The August 2003 will left the property to Jourdan but did not address the balance of Comins's estate; also, it made no mention of the Copelins or Harris. When Jourdan returned Comins to her house, Comins reportedly told Jourdan not to say anything to Harris about the will. She also told Jourdan to take the originals of the will and power of attorney with her to California, because "we're only going to use them if we need them." Jourdan complied with her request and returned to California with the original documents.

Harris, however, knew that "something was in the works." After Jourdan left, Harris asked Comins what had happened. According to Harris, Comins said that she had signed some papers but that she was not sure what she had signed. She then told him, "I think I gave away the property." Harris testified as follows regarding the conversation:

> "And I said, 'What? You gave away the property? Why do you want to do that?' And she said, 'I don't know.' And I said, 'Well, is that what you want to do?' And she said, 'No.' I go 'Well, then you signed something that you don't know what you signed and you're not sure what you want to do with it? You know, you don't want to do that. Well, why would you sign it?' And she said, 'I don't know. I thought it was going to help me financially or something.' And I said,

'Well, you've—you should get ahold of a lawyer, your lawyer and talk about this.' "

Harris also directed Comins to express her feelings in writing. The result was a notation—on the bottom of a grocery list—that stated,

> "Summer persuaded me to sell my house to her and her husband with the promise that I could live here until I die. I really did not want to do this. I signed a paper which I do not have a copy. My feeling was that this was a too hasty decision."

The notation, which is dated August 23 and is signed by "Ruth M. Comins," also contains a postscript: "I do not want her to have the house or property."

At trial, Harris initially denied that he had any involvement in drafting the notation. When confronted with his previous deposition testimony regarding it, Harris acknowledged that he was mistaken and that he had encouraged Comins to write the note to give to Swift. Harris was unable to explain why the note was dated seven days before Comins signed the will and power of attorney; he acknowledged that it was "very possible" that the document had been incorrectly backdated.[8]

Comins subsequently contacted Swift about the August 2003 will and power of attorney and apparently told Swift to continue drafting a new will in favor of Harris. Swift did so and attempted to obtain the will and power of attorney documents that were in Jourdan's possession. Jourdan did not return Swift's calls or pick up the certified mail that he sent to her. When Swift finally was able to speak with her on the phone, Jourdan refused to turn over the documents. According to Jourdan, she did not believe that Swift "was who he was saying he was."

Swift, meanwhile, continued working on a new will in favor of Harris. On October 20, 2003, Harris took Comins to Swift's office, where she executed a new will that made

---

[8] Although the record is unclear on this point, the other possibility is that the note concerns a separate discussion between Comins and Jourdan regarding the sale of the property—a discussion that preceded the drafting of the August will.

Harris the primary beneficiary of her estate. The will provided that, in the event that Harris did not survive Comins, her estate went to Harris's son, whom Comins had never met. The will did not mention Jourdan or the Copelins.

Six days after the October 2003 will was drafted, Comins and Harris prepared a four-page letter to Swift that further explained Comins's intentions with regard to the property. According to Harris, Comins wanted to write a letter that would be read upon her death "so people would understand what happened." The letter, which states that it is "Written by Jack Harris for Ruth Comins in my words," explains that Jourdan and the Copelins abandoned her and that she wanted Harris to have the property. It concludes:

> "When it comes to talking about all of this I am embarrassed that we have to mention how [Jourdan] wanted my property & I really don't want to talk about it, but this letter had to be written, just in case anyone would come back here and try to cause trouble for Jack after I'm gone! Hopefully, Jack Harris will not ever have to dig up this letter! I really would like all of you to love me for who I am and honor my decision! Love me, not my property * * *."

At trial, Harris explained that he assisted in drafting the letter by thinking "of everything that I knew in my head, things that she knew and I tried to help her with that." In that way, Harris tried to "helped her remember" what Comins wanted to put in the letter.[9]

Sometime in late October or early November, Comins asked Jourdan to return the documents that had been signed in August. According to Jourdan, Comins told her that she simply wanted a lawyer to review the documents to make sure that there was no mistake in them. Jourdan returned the documents to Comins, and Comins later confirmed that she had received them. Jourdan testified that she was not sure whether she sent a copy of the will to Comins or the original will. At the time of trial, Jourdan was unable to locate the original August 2003 will. Swift likewise testified that he did not know whether he received the originals or

---

[9] Although the letter is dated October 27, 2003, the envelope in which it was mailed to Swift is stamped "Received October 26, 2003." Harris was unable to explain that inconsistency.

copies from Comins. He testified, however, that it is his ordinary practice to destroy the original and keep copies of what he destroyed, but he did not know whether he followed that practice with respect to the August 2003 will.

Throughout the period in which Swift was drafting the October 2003 will, Comins and Harris were also in the process of refinancing the mortgage on Comins's property. According to Harris, the purpose of the refinance was to obtain a lower interest rate and to get cash out of the property to pay Harris for the work that he had done and for future improvements to the house; at the time of the refinance, Harris calculated that Comins owed him between $2,500 and $3,500.

Although Comins's banking was done with Retzlaff at Washington Mutual, the cash from the refinance was not put into an account there. Rather, the cash went to a new joint checking account that Harris and Comins opened at Bank of America. Harris acknowledged that the cash was moved to a new checking account so that Retzlaff would no longer have any oversight of that account.

The new joint checking account was significantly drained over a 10-week span, even though Harris, by his own admission, "really didn't get a whole lot done" on the house. Some of the money was withdrawn by Harris for gambling purposes at casinos; other money was spent on dinners, leather coats for Harris and Comins, and trips to the beach.

The funds in the joint checking account were also used to make payments on a new Chrysler Sebring convertible that Harris and Comins purchased. Around the same time that Harris sold the van that he had been driving, Comins and Harris received fliers from a car dealership indicating that they had won a prize. They both went to the dealership and saw the convertible. According to Harris, he did not want to buy the convertible, but Comins insisted. Although Harris's credit was not good enough to purchase the car, Harris and Comins were able to purchase the car together. Ultimately, they purchased the car for $28,267.50, and payments were taken from the joint checking account.

Harris encouraged Comins to document their financial arrangement. In a note dated September 1, 2003, Comins wrote, "Jack Harris is my trusted friend and I have given him permission to take money out of my bank account for his own and my personal reasons and I am repaying him for money he has spent on my property." At trial, Harris testified that he did not encourage Comins to write the September 1, 2003, note. At his deposition, however, Harris had previously testified that he told Comins to "write something down that I am taking money out. If no one knew it, you know, wouldn't be good."

Harris continued to live with Comins through December 2003. In the middle of December, Jourdan telephoned Comins and asked whether Harris was still living on the property. Comins said that he was, but that Harris recently met a woman named Jackie whom he was planning to marry.

In January 2004, Harris moved to a residence with his new wife, Jackie, but continued to regularly visit Comins. At some point in January, Jackie Harris took Comins to Washington Mutual to meet Retzlaff. Jackie Harris testified that she knew that Retzlaff was distrustful of her husband and that she simply wanted to defuse any concerns that Retzlaff might have regarding her involvement in Comins's finances. According to Retzlaff, Jackie Harris told her that she and her husband would be taking care of Comins and that Retzlaff needed to trust them. She further told Retzlaff not to talk to Jourdan.

Retzlaff was troubled by her contact with Jackie Harris, and she called Comins to schedule a lunch between the two of them. Comins initially declined, which was unlike her usual response. Retzlaff grew increasingly concerned and asked Comins again if she could come out to meet her for lunch. When Retzlaff arrived at Comins's house, Jackie Harris was there. Jackie Harris told Retzlaff that Comins "all of a sudden was afraid of [Retzlaff] and didn't want to have lunch by herself with [her]." After a few moments, Jackie Harris agreed to let Retzlaff speak privately with Comins, as long as Retzlaff promised that she would not ask Comins to sign anything.

After the lunch with Comins, Retzlaff spoke with her manager at the bank and then called Jourdan. Jourdan told her that she would come up from California to check on Comins. Jourdan was also alarmed because she had attempted to call Comins and found that the phone number had been disconnected. The Harrises both testified that Comins's phone number was changed because Comins was receiving calls from psychics and other people seeking money. Swift's files, however, contain the following notation:

> "I put on the front of [Comins's] file a new phone number. Apparently, they've been having trouble with Summer Jourdan again, trying to call, and they are changing the number to avoid that. So I put the new number on [Comins's] file, on the front * * *."

In late January, Jourdan returned to Oregon to check on Comins. Jourdan showed up unexpectedly at Comins's house and invited her to breakfast. Over breakfast, Jourdan invited Comins to come back with her to California to live. She also brought a power of attorney form with her, which she asked Comins to sign. She subsequently drove to the Washington County Courthouse and petitioned for a restraining order against the Harrises, and went to the post office to find out why Comins's mail was being forwarded to the Harrises. Jourdan found that the change of address form on record with the post office had been signed by Comins, but Comins did not recall signing it.[10]

On her way to the post office, Jourdan had received a telephone call from a Washington County deputy who informed her that Harris had reported that Comins had been kidnapped. Jourdan did not return to Comins's house that night, and instead went to a hotel. She then called Harris and advised him of the restraining order.[11]

---

[10] The Harrises both testified that the mail was forwarded to them to avoid the possibility that Comins would injure herself walking to her mailbox in inclement weather.

[11] The petition for a restraining order was supported by statements that were found to be exaggerated or untrue by the issuing court, and the Harrises ultimately prevailed and were awarded attorney fees with respect to the petition. Other than reflecting, to a limited extent, on the credibility of Jourdan, that proceeding has no relevance to the issues before us.

In the days that followed, Comins attempted to execute a new will in favor of Jourdan. Retzlaff had informed Jourdan of the existence of other wills, and Jourdan procured a form and prepared a new will that was dated January 26, 2004. The January 2004 will, however, was witnessed by only one person.[12] Later, Jourdan convinced Comins that, because her name was still on the title of the car that Harris was driving, Comins and her property were exposed to liability. At that point, Comins executed a deed that transferred the property to Jourdan.

Comins ultimately moved to California, and Jourdan and her fiancé took over the management of Comins's finances. Comins continued to live with Jourdan in California until her death in August 2004. The Harrises lost contact with Comins and did not learn of her death until March 2005.

In April 2005, Harris petitioned for his appointment as the personal representative of Comins's estate and for the probate of the October 2003 will. Jourdan contested the probate of the will on the ground that it was procured through undue influence. She alleged that she is "the residuary beneficiary of Ruth M. Comins's previously-executed Will dated August 30, 2003, and is thereby entitled to contest the admission to probate of the purported Last Will dated October 20, 2003." She attached a copy of the August 2003 will as an exhibit to her petition to contest the probate of the will.

In response to the petition to contest the probate of the October 2003 will, Harris denied that he had unduly influenced Comins, alleged that the August 2003 will was procured by Jourdan's undue influence, and alleged that Jourdan lacked the capacity to contest the October 2003 will because she had no interest in the estate. Harris also filed a separate civil action alleging that Jourdan had secured a deed to Comins's home by way of undue influence. The cases were consolidated for trial.

The probate court first considered the will contest and concluded that the October 2003 will was the product of undue influence. The court then vacated its previous order

---

[12] Jourdan has not asserted in this case that the January 2004 will is valid.

appointing Harris as the personal representative of the estate and, consequently, dismissed the civil action on the ground that Harris had no standing to pursue a claim on behalf of Comins's estate. Harris appeals.

## II. ANALYSIS

■ On appeal, Harris advances two assignments of error. In his first assignment, he argues that the probate court erred in concluding that Jourdan was an "interested person" who could contest the probate of the will. In his second assignment of error, Harris argues that, in any event, the evidence was insufficient to prove that he procured the October 2003 will through undue influence. For the reasons that follow, we reject Harris's arguments and affirm the judgment of the probate court.[13]

Under Oregon law, the question whether a person has "standing" to contest a will is a matter of statute. ORS 113.075(1) provides that "[a]ny interested person may contest the probate of the will or the validity of the will * * *." An "interested person," in turn, "includes heirs, devisees, children, spouses, creditors and any others having a property right or claim against the estate of a decedent that may be affected by the proceeding." ORS 111.005(19).

The question, then, for purposes of determining whether Jourdan is entitled to contest the probate of the will, is simply whether she can demonstrate the existence of a property right or claim that "may" be affected by the proceeding. Here, Jourdan has adequately demonstrated that, if the October 2003 will were declared invalid, she would have inherited under the last facially valid will executed by Comins—the August 2003 will.

Harris, however, argues that Jourdan must do more to prove that she is an interested person entitled to contest

---

[13] Although he has appealed both judgments, Harris does not separately challenge on appeal the trial court's judgment dismissing the civil action. Rather, he argues that, if he were to prevail on appeal with regard to the will contest, the judgment in the civil action must be reversed as well.

the probate of the October 2003 will. According to Harris, Jourdan must actually *disprove* that the August 2003 will was itself the product of undue influence. For that proposition, Harris relies on *In re Carlson's Estate*, 153 Or 327, 56 P2d 347 (1936). In that case, the decedent, Carlson, signed two wills in the last year of his life. The first was signed in Oregon and the second was signed in Sweden. Both wills were offered for probate. The original of the Oregon will, however, was last seen in Carlson's possession, and no one was able to find it after his death. The issue, the court explained, was "whether the decedent revoked the [Oregon] will and, if he did, whether the Swedish will is entitled to probate in this state." 153 Or at 328. The court specifically noted that "[t]here are no charges of undue influence or of lack of testamentary capacity." *Id.*

With respect to the Oregon will, the court in *In re Carlson's Estate* explained that, " 'If, when last seen, the will is shown to have been in the possession of the testatrix, and cannot be found, it must be presumed, in the absence of other evidence, that she destroyed it[.]' " 153 Or at 332 (quoting *In re Miller's Will*, 49 Or 452, 456, 90 P 1002 (1907)). Applying that principle to the facts in *In re Carlson's Estate*, the court concluded:

"The proponents of the Oregon will have proved no circumstance whatever which indicates that the Oregon will was not revoked. Quite to the contrary, the circumstances proved are in harmony with the presumption of revocation. For instance, Carlson's experiences in Oregon—confinement in the hospital for the insane, the parole, the guardianship, confinement in a hospital, and the heavy expenses attendant thereon—must have been unhappy for him. The execution of the will arose out of these unhappy and expensive experiences. Next, we have proof that upon his return to his native land he there executed another will at complete variance with the Oregon will. Without further mention of the facts, we express our conclusion that the circumstances establish the revocation of the Oregon will."

153 Or at 333.

After concluding that the Oregon will had been revoked, the court concluded that it was "not authorized" to

entertain the challenges to the probate of the Swedish will that were brought by the proponents of the Oregon will. The court observed that "it is evident that a beneficiary of a revoked will has no interest in the estate of the decedent which entitles him to contest the validity or the probating of a subsequent will." 153 Or at 336. Thus, because the Oregon will was revoked, the proponents of that will had "no interest which entitles them to question the proceeding pursued by the respondents to probate the Swedish will." *Id.*

According to Harris, *In re Carlson's Estate* requires this court to first determine the validity of the August 2003 will before entertaining Jourdan's contest of the October 2003 will. We disagree. *In re Carlson's Estate* was decided under a different statutory scheme, and one that did not contain the current definition of an "interested person." Moreover, *In re Carlson's Estate* involved the application of an evidentiary presumption—that the Oregon will had been destroyed by the testator—that had not been overcome by the contestants; it did not purport to require probate courts to first litigate all of the factual circumstances surrounding a contestant's will before allowing the contestant to challenge a later will on the ground that it was procured by undue influence.

■ Nothing in the statutory definition of an "interested person" or Oregon case law suggests that a will contestant who seeks to inherit under an earlier, facially valid will must also demonstrate that the earlier will could survive a will contest. Accordingly, the trial court correctly declined Harris's invitation to engage in a "will contest within a will contest" analysis.

■ Harris makes the further contention that this case presents "precisely the facts set out by *In re Carlson's Estate*: an original will, solely in the control of the testatrix, and which is never found." From that premise, Harris argues, it must be presumed that Comins destroyed the original August 2003 will and thereby revoked it, leaving Jourdan without any basis to contest the later will. The evidentiary presumption in *In re Carlson's Estate* simply is not applicable

in this case. In *In re Carlson's Estate*, the contention was that the earlier will relied upon by the contestants had been revoked independently of the execution of the last will of the testator. Here, by contrast, Harris has never contended that the August 2003 will was destroyed entirely independently of his influence on Comins's decision to draft the October 2003 will.[14] Thus, even assuming that the original of the August 2003 will was destroyed, the only relevant question is whether the October 2003 will—and resulting revocation of the August 2003 will—was procured by Harris's undue influence.

■■ We turn, then, to Harris's argument that the trial court erred in concluding that the October 2003 will was the product of undue influence. Undue influence "has been characterized as 'a species of fraud' " by which a beneficiary gains an unfair advantage from wrongful conduct. *In re Reddaway's Estate*, 214 Or 410, 420, 329 P2d 886 (1958). To some extent, "every will is the product of some kind of influence. It is the task of the courts to determine whether the influence in the particular case is 'undue.' " *Id*. at 418 (citation omitted). The focus of the inquiry is on the conduct of the person allegedly exercising undue influence and whether that person "gained an unfair advantage by devices which reasonable [people] regard as improper[.]" *Id*. at 419.

■ The burden of proving that a will is the product of undue influence is on the contestant, in this case, Jourdan. *Id*. at 420. However, under certain circumstances, there may arise a "suspicion of undue influence so as to require the beneficiary to go forward with the proof and present evidence sufficient to overcome the adverse inference." *Id*. (quoting *In re Southman's Estate*, 178 Or 462, 482, 168 P2d 572 (1946)). Specifically, a suspicion of undue influence arises where (1) the contestant first proves that a confidential relationship existed between the testator and the beneficiary, such that the beneficiary held a position of dominance over the testator; and (2) the contestant establishes the existence of "suspicious circumstances" surrounding the procurement

---

[14] Because Harris never contended in the probate court that the August 2003 will was independently revoked, we do not address that question or the application of any evidentiary presumptions relevant to that question.

or execution of the will. *Id.*; *Knutsen v. Krippendorf*, 124 Or App 299, 308, 862 P2d 509 (1993), *rev den*, 318 Or 381 (1994) (explaining the burden-shifting approach in undue influence cases).

Here, Harris concedes that he and Comins had a confidential relationship, but he contends that the relationship was not one in which he exercised the type of *dominance* over Comins that would trigger the burden shifting identified in *In re Reddaway's Estate*. 214 Or at 421 (finding a confidential relationship where "the relationship is such as to indicate a position of dominance by the one in whom confidence is reposed over the other"). We disagree. The record demonstrates that Comins trusted and depended on Harris and that Harris exercised a considerable amount of control during their relationship. Among other things, he assumed control of her finances, selected her attorney, directed her to write letters to her attorney regarding her donative intent, provided her with physical care, cooked for her, and took care of her property. Moreover, as the trial court noted, after Harris arrived, Comins began spending money on objects like leather coats and a new convertible, objects that she never previously would have purchased. Under the circumstances, we readily conclude that Harris and Comins were in a confidential relationship in which Harris exercised some degree of dominance. *See Knutsen*, 124 Or App at 309 ("[A] finding of dominance does not require evidence that an authoritative, controlling person bullied or directed the actions of a subservient one. Dominance can be expressed more subtly, such as by suggestion or persuasion or by fostering a sense of need and dependence."); *see also Sangster v. Dillard*, 144 Or App 210, 218, 925 P2d 929 (1996), *modified on recons*, 146 Or App 105, 931 P2d 815 (1997) ("[D]ominance is found where the testator is guided by the beneficiary's judgment and advice in the period leading up to execution or destruction of a will.").

Besides the fact that Harris was in a confidential relationship with Comins in which he exercised dominance, we consider the existence of "suspicious circumstances," as outlined in *In re Reddaway's Estate*, to assess whether the October 2003 will is the product of undue influence:

## A. *Procurement*

"One of the circumstances frequently relied upon in the cases as indicating improper influence is the participation of the beneficiary in the preparation of the will * * *." 214 Or at 421. Here, Harris was intimately involved in the preparation of the will, from selecting an attorney, to directing Comins to document certain events and feelings for purposes of the will, to suggesting that his son be named as a beneficiary in the will.

## B. *Independent Advice*

Although Comins had the benefit of an attorney during the drafting of the October 2003 will, Harris was closely involved in the relationship between Swift and Comins. He selected Swift, participated in some meetings with the two of them, and directed Comins to write letters to Swift. On this record, as in *In re Reddaway's Estate*, "[a]lthough there was the opportunity for independent advice under these circumstances it is quite possible that it would not have been heeded." 214 Or at 422-23.

## C. *Secrecy and Haste*

Twelve days after Harris began living on the property, he contacted Swift about the possibility of Comins drafting a new will. Moreover, the beneficiaries of Comins's previous wills—the Copelins and Jourdan—were not notified of Comins's intent until they received a request from Swift to return the earlier wills.

## D. *Change in Decedent's Attitude Toward Others*

After the arrival of Harris, Comins manifested an unexplained change in attitude toward a number of her friends. For example, she accused both Jourdan and the Copelins of caring only about her property. She also developed an unexplained fear of Retzlaff, whom she had previously trusted with her finances. Although the record suggests that Comins was predisposed to feeling abandoned by those around her, the fact that many of her previous relationships became strained after the arrival of Harris—and particularly that she rejected Retzlaff—suggests that Harris may have

been partly responsible for or encouraged Comins's change in attitude.

## E. *Change in the Testator's Plan of Disposing of Her Property*

 ██ In certain circumstances, a variance between a new will and previous wills will be regarded as a suspicious circumstance justifying an inference of undue influence. 214 Or at 424. Here, this factor is not particularly helpful, given the multiple changes in Comins's plans. Because it is difficult to discern any settled purpose running through previous wills—other than to leave the property to whomever was helping her the most at the time—the fact that she changed the donative object of her property is not particularly suspicious. However, when coupled with the unexpected change of attitude toward previous objects of donative intent, and the fact that Harris contacted an attorney to draft the will just 12 days after moving onto the property, the change in plans becomes more suspicious.

## F. *Unnatural or Unjust Gift*

> "Where there is a confidential relation between the donor and donee and the gift results in shunting the property away from those who had a reasonable expectation of being the recipients of the donor's bounty, the law places the burden on the donee to produce evidence that improper influence was not used."

214 Or at 426. Here, it is particularly curious that Harris's son—whom Comins apparently had not met—was a beneficiary under the will, but that Jourdan (who was Comins's longtime friend) and the Copelins (who were beneficiaries under a previous will) were not even mentioned.

## G. *Donor's Susceptibility to Influence*

 "The physical and mental condition of the donor is regarded as a factor of importance in determining whether a disposition of property was the result of undue influence." 214 Or at 426. That is, "[i]n many of the cases the fact that the person alleged to have been unduly influenced was enfeebled in mind or body is pointed to as evidence that [her] free will had been affected." *Id*. Harris does not dispute that Comins was susceptible to influence. In this case, this factor

is particularly significant, given the degree to which Comins sought to please those who offered affection—even in the case of a financial predator in Canada.

## III. CONCLUSION

For the reasons explained above, Jourdan is an "interested person" within the meaning of ORS 113.075(1). Accordingly, we reject Harris's "lack of standing" argument. Moreover, considering all the above factors, we conclude that the circumstances surrounding the execution of the October 2003 will were sufficiently suspicious that, when coupled with the relationship between Harris and Comins, there arises an inference of undue influence. We further conclude that Harris has not offered evidence that sufficiently dispels that inference. Accordingly, we agree with the trial court's conclusion that the October 2003 will is invalid because it is the product of undue influence.[15]

Affirmed.

---

[15] At the time of trial in this case, Jourdan had not submitted the August 2003 will for probate. Accordingly, we express no opinion in this case as to whether the August 2003 will was the product of her undue influence or would otherwise be susceptible to a will contest pursuant to ORS 113.075.